215 S.E.2d 918 (1975)
BOARD OF SUPERVISORS OF CAMPBELL COUNTY et al.
v.
APPALACHIAN POWER COMPANY et al.
Record Nos. 741073 and 741074.
Supreme Court of Virginia.
June 13, 1975.
*919 A. David Hawkins, Richard W. Elliott, Rustberg (W. H. Overbey, Overbey & Overbey, Rustberg, on brief), for appellants.
John L. Walker, Sr., Roanoke (Thomas F. Lemons, Jr., Woods, Rogers, Muse, Walker & Thornton, Roanoke, on briefs), for appellees.
Edward Berlin, Washington, D. C. (Arthur B. Davies, III, Eric G. Peters, Lynchberg, Berlin, Roisman & Kessler, Washington, D. C., Davies, Smith & Peters, Lynchburg, on amicus curiae brief), for *920 Central Virginia Environmental League and Lynchburg Environmental Group.
Richard D. Rogers, Jr., Richmond (Lewis S. Minter, Roanoke, on brief), for State Corp. Comn.
Before I'ANSON, C. J., and CARRICO, HARRISON, HARMAN and COMPTON, JJ.
HARRISON, Justice.
Virginia Code § 56-46.1 requires the State Corporation Commission to approve the location of certain new electric transmission lines, and as a condition to determine that the route the line is to follow will reasonably minimize adverse impact on the scenic and environmental assets of the area concerned.
On August 16, 1972, Appalachian Power Company filed application for a certificate of public convenience and necessity authorizing it to construct a proposed 765 kilovolt transmission line along a route or corridor extending from its Cloverdale Station in Botetourt County to a proposed substation site which it owns at Ivy Creek in Bedford County, 4 miles west of Lynchburg. The application was filed pursuant to Code §§ 56-46.1 and 56-265.2 et seq., and the required notices of filing were given. Public hearings on the application were held at the request of interested parties who opposed the application. A hearing was held in Bedford on November 15, 1972, and thereafter in Richmond on twelve separate days. At the request of certain intervenors the Commission viewed the routes which were then under investigation.
On July 20, 1973, the Commission concluded that the evidence introduced had established a need for a 765 kv transmission line to serve the Lynchburg-Bedford area and entered an order to that effect. The order further recited that, in addition to the line proposed in its application, Appalachian had presented data and information regarding four alternate routes the proposed line could follow; that two of the alternate corridors were north of the Ivy Creek route proposed by Appalachian, and two were south of it; and also that an alternate plan had been proposed by Dr. George C. Szego, President of Intertechnology Corporation of Warrenton, for transmitting electric energy to the area. The Commission determined that the two northern alternate corridors and the alternate plan would not be further considered. It continued investigation of the Ivy Creek route and the two southern alternatives, and instructed Appalachian to furnish information and data regarding the feasibility of a route lying south of Lynchburg and terminating at a substation to be located east of that city. A copy of the July 20, 1973 order was served on the officials of Campbell County and other interested parties who might be affected by the line, the feasibility of which was to be studied.
Appalachian reported on October 26, 1973, that a feasible route existed south of the Ivy Creek route and south of Lynchburg, and that a feasible substation site had been found east of Lynchburg. This route became known as the Joshua Creek route.
Thereafter, and pursuant to the Commission's order of December 6, 1973,[1] notice was published and given to officials of Campbell County and to others that the Joshua Creek route was under consideration as the route which Appalachian's proposed 765 kv transmission line would follow. Requests for a hearing were received by the Commission, and by order entered February 8, 1974, a hearing was set for March 11, 1974. At that time the Commission received testimony from a number of witnesses *921 for Campbell County and others concerning the Joshua Creek route. A personal inspection was made of the route by all three Commissioners on April 5, 1974, at which time they were accompanied by representatives of the parties to this proceeding.
On July 5, 1974, the Commission entered an order directing that the transmission line be constructed along the Joshua Creek route, to which order appellants filed notice of appeal and assignments of error.[2] This appeal is before us as a matter of right.
While the appellants have made twenty assignments of error, the dispositive questions involve: (1) the need of the Lynchburg-Bedford area for additional power; (2) the use of a 765 kv transmission line to supply the power; and (3) whether or not the Commission complied with Code § 56-46.1 in approving the Joshua Creek route.
The Commission's finding of need is fully supported by the record. There was testimony that electrical demands in the area have increased at a steady rate and that there will be a need by 1976 for reinforcement of existing power systems to avoid curtailment of power and possible interruption of service. A utility must construct electrical generating and transmitting facilities to supply the peak electrical demands of its customers. To provide reliable electric service a utility must be able to satisfy the collective-use needs, at any given moment, of all its customers.
Appalachian's Executive Vice-President, W. S. White, Jr., testified that the 1971 peak load demand in the area was 227,000 kw and projected that load to increase to 350,000 kw by 1975, to 500,000 kw by 1980, and to 750,000 kw by 1985. The Commission's staff consultant, Sam G. Berry, Assistant Professor of Finance in the School of Business at Virginia Commonwealth University, projected that the peak load would be 343,000 kw in 1975-76, 486,000 kw in 1980-81, and 684,000 kw in 1985-86. Dr. Szego, testifying on behalf of the Central Virginia Environmental League, predicted that the consumption of electrical energy and the peak load would grow at an annual rate of about 7.4%. His adjusted predictions reflect an estimated peak load of 324,000 kw for the 1975-76 winter season, 463,000 kw for 1980-81, and 662,000 kw for 1985-86.
Raymond M. Maliszewski, an official of the American Electric Power Service Corporation, testified that additional capacity will be needed in the Lynchburg-Bedford area when the peak load reaches 350,000 kw, which is estimated to be reached in 1976. Ernest M. Jordan, Jr., Director of the Commission's Division of Public Utilities, agreed that Appalachian needed additional facilities to supply the growing power demands of the area and to interconnect with neighboring electrical utility systems. In Jordan's opinion "time is becoming a critical factor and... steps should be taken in the near future to meet this additional power need".
In determining the question of need, the Commission properly considered the present and the future needs of the entire Lynchburg-Bedford area, and it found substantial evidence showing the existence of need for additional power.
We now consider whether one 765 kv line is the proper facility to supply the power needs of the area and to reinforce Appalachian's transmission facilities. A 765 kv line is a massive, extra-high voltage facility. Appellants say that it is thirty times more powerful than anything presently in the Lynchburg area. The rights-of-way are 200 feet wide, and the towers extend up to 180 feet in height.
*922 Appalachian argues that by taking advantage of the efficient transmission of power and extra-high voltage it can utilize its extensive generating force in West Virginia and in Southwest Virginia to supply power to its Lynchburg-Bedford area customers. It was testified that the line would allow the Lynchburg-Bedford area to be tied to a generating station located along a 765 kv transmission system which starts at Lake Michigan and crosses the western border of Virginia into Dickenson County. Approximately 300 miles of this line have already been constructed in Virginia, and a portion thereof has been in operation for over five years. The Commission authorized extension of the line along the Joshua Creek route terminating east of Lynchburg. Ultimately Appalachian plans to extend its line south from Lynchburg to the Martinsville-Danville area, and then west to tie in with existing 765 kv facilities at Jackson's Ferry, Virginia.
For understandable reasons appellants are concerned with how the proposed line between Roanoke and Lynchburg may affect their interests. Appalachian and the Commission must consider the line not only for its value to one particular area but also as a part of an overall electrical system. It was testified that the needs of the area could be met by construction of lines having a lower power voltage capacity, but that transmission at 765 kv has significant economic advantages. The Commission found as a fact that installation of higher voltage lines is more economical than installation of lower voltage lines; and that, except for limitations such as the thermal capacity of conductors, one 765 kv line has the equivalent load-carrying capability of five 345 kv lines or thirty 138 kv lines.
Intervenors urged the use of Appalachian's existing facilities and rights-of-way instead of a new route. Such use would not result in additional voltage reinforcement to the area, and mere construction of lines does not help meet the load growth unless the lines are tied to a power source, i. e., a power plant to generate electric power. The critical problem is that of voltage reinforcement. Jordan testified that the best method of meeting a projected peak electrical load was with additional transmission facilities. He admitted that the additional electric capacity could be supplied by a power plant in the area, if a site was available, but that this would not avoid the need for additional transmission facilities, or the necessity to interconnect power plants with transmission lines. The Commission concluded that use of high voltage lines constitutes a more efficient utilization of a given right-of-way in terms of load-carrying capacity.
The intervenors introduced witnesses to demonstrate that the use of a 765 kv network is unsafe and damaging to the environment. Mrs. Louise B. Young said transmission at the proposed voltage is still experimental and further testing is indicated before such lines are put into universal use. Dr. Robert H. Giles, Jr. expressed concern over the ecological effect of the line. Witnesses also directed the Commission's attention to problems attending the removal of ground cover, the building of access roads to serve the right-of-way, the use of herbicides to control right-of-way vegetation, the impact of towers and lines upon the scenery and the possibility of migratory birds being killed by flying into the towers. It is also contended that the energized line would result in harmful ozone production, radio and television interference, shock caused by electro-static induction and audible noise.
The Commission agreed that clearing and maintaining the right-of-way and the presence of towers with lines will be detrimental to the environment, and that the line itself detracts from the beauty of the area through which it passes. However, the problem which confronts Appalachian, and therefore the Commission, is that the company is a public service corporation, charged with the duty and responsibility of providing *923 sufficient current at the most reasonable price possible. This energy must be supplied in adequate quantity, and with the least adverse impact on the area.
To counter the objections to a 765 kv line the appellees say that over 3,000 miles of 735 kv and 765 kv lines are successfully operated in the United States and Canada. In the American Electric Power system, of which Appalachian is a part, there are more than 1,000 miles of 765 kv transmission lines in operation, of which approximately 300 are located in Virginia. Jordan investigated the area of the state where the lines are located to determine if the citizens had any cause for complaint. His office had received no complaints about the operation of the lines, and he said that none had been received by local government representatives. Based on his investigation and his experience with other extra-high voltage transmission lines, he testified that he did not believe the lines should be considered a hazard to public safety.
Brendan J. Ware, who heads the Electric Research Section of the Electrical Engineering Division of American Electric Power Service Corporation, described certain tests made by the electric industry from which he concluded that an energized 765 kv line is not dangerous to human or plant life. Ware said that audible noise, electric shock and interference with radio and television reception could be controlled.
Intervenors urged delay in construction to await a technological advance which might render obsolete an overhead transmission line. We regret that technology has not yet devised a way to transmit electric current in an efficient and economical manner without the use of unsightly overhead transmission lines. The record shows that even lower voltage transmission lines have been placed underground only for short distances and at great cost. The undergrounding of high voltage lines is still in the experimental stage and has not been found feasible. The need confronting Appalachian is a present need and cannot await experimentation or an uncertain future alternative to an overhead high voltage line.
The Commission found that the presence of an energized 765 kv transmission line can cause problems to those living in close proximity to it. However, it further found that there is nothing to indicate that any identified problem is without remedy or is significant enough to cause a denial of the application.
Finally we consider whether the Commission has properly complied with Code § 56-46.1 in its approval of the Joshua Creek route. The intervenors feel strongly that the action of the Commission amounts to "site locating".
Prior to the most recent revision of the Constitution of Virginia and the passage by the General Assembly of Code § 56-46.1, the Commission did not assert authority over the location of transmission lines and generating plants. Virginia has effected a transition from a rural to an urban state and has experienced rapid population growth and industrialization in certain areas. As a result her people have become increasingly aware of the environment, the necessity for clean air, open spaces, pollution-free streams, and the preservation of forests, historical sites and places of scenic beauty.
It was in the 1971 revision of the Constitution of Virginia that a provision was inserted which established the policy of the Commonwealth to
"conserve, develop, and utilize its natural resourses, its public lands, and its historical sites and buildings.... to protect its atmosphere, lands, and waters from pollution, impairment, or destruction,..." Article XI, Section 1
In 1972 the General Assembly enacted Code § 56-46.1, directing the State Corporation Commission to effect a balance between *924 environmental factors and economic and other traditional considerations where the construction and location of electrical transmission lines were involved. This represented an increased emphasis in environmental concerns by the legislature. As a result a public utility seeking approval of a proposed transmission line route must obtain a certificate of convenience and necessity (Code § 56-265.2) and must also comply with Code § 56-46.1 which provides, in pertinent part, as follows:

"Commission to consider environmental factors in approving construction of electrical utility facilities; approval required for construction of certain electrical transmission lines; notice and hearings. Whenever under any provision of law whatsoever, applicable to the Commission, the Commission is required to approve the construction of any electrical utility facility, it shall give consideration to the effect of that facility on the environment and establish such conditions as may be desirable or necessary to minimize adverse environmental impact....
"No electrical transmission line of two hundred kilovolts or more shall be constructed unless the State Corporation Commission shall, after at least thirty days' advance notice by publication in a newspaper or newspapers of general circulation in the counties and municipalities through which the line is proposed to be built, and written notice to the governing body of each such county and municipality, approve such line. As a condition to such approval the Commission shall determine that the corridor or route the line is to follow will reasonably minimize adverse impact on the scenic and environmental assets of the area concerned...."
In the instant case the Commission considered available data and information on all routes. The Commission rejected the alternate northern routes because both would have caused serious environmental problems, particularly to the natural forests, and both would have crossed the Blue Ridge Parkway at locations considered undesirable by parkway officials. The two southern alternate routes were dismissed from consideration by the Commission's order of December 6, 1973. Both southern routes were longer than the Ivy Creek route and terminated at the Ivy Creek substation site. The Commission rejected Dr. Szego's alternate plan for supplying the power needs of the area because it would require the expenditure of over $40 million more than the anticipated cost of the company's proposal; four 500 kv lines constructed on parallel rights-of-way for a distance of approximately 18 miles; and raise essentially the same environmental problems as the two northern routes.
The Board of Supervisors and citizens of Campbell County contend that they were not given the notice required by § 56-46.1, and were denied the right to be heard and to present all relevant evidence. The record shows otherwise. On December 6, 1973, the Commission gave interested parties the required statutory notice that the Joshua Creek route was under investigation. Campbell County was not involved in the proceeding until the Commission had considered Appalachian's October 26, 1973 feasibility study, although the county had been notified that such a study was being made. Prior to the completion of the study, neither the Commission nor Appalachian had certain knowledge of the additional counties and municipalities that would be affected by the route which the Commission suggested to the south and east of Lynchburg.
The December 6, 1973 notice was served and published, and Campbell County officials and other interested parties were given until January 31, 1974, to submit comments to the Commission or to request a public hearing. On February 8, 1974, the Commission ordered that a public hearing be held on March 11, 1974, and that notice *925 of the hearing be given. Approximately two months transpired between the first official notice of the proposed Joshua Creek route to the citizens and officials of Campbell County and the March 11, 1974 hearing. The line was not approved until July 5, 1974, seven months after it became necessary for Appalachian and the Commission to involve Campbell County in the proceeding. The only time limitations found in § 56-46.1 are the thirty days notice before approval of a line, and that any public hearing or hearings requested by an interested party be conducted as soon as reasonably practicable after the request is made. Both time limitations were met in this case.
The record shows that citizens and representatives of Campbell County have participated fully and constructively in all proceedings in this case subsequent to December 6, 1973. Indeed, the Board of Supervisors of Campbell County by resolution, and one of appellants' counsel in open hearing, conceded the need of the area for additional power. Regarding notice, counsel requested additional notice to the people of Campbell County or a personal view by the Commission of the Joshua Creek route as it affected the county. The Commission granted the request for a view.
In this case the real issue is whether the State Corporation Commission had a right to consider a route for the proposed 765 kv line other than the one proposed by Appalachian and, if so, whether there is evidence to support its approval of the Joshua Creek route. We think it clear that it was the intent of the General Assembly in enacting Code § 56-46.1 that the Commission obtain all relevant environmental information reasonably necessary for it to make a considered judgment; that it was proper for the Commission to have considered the alternate routes to the one proposed by Appalachian; and for it to have requested a study made of a route which the evidence developed as one that might, to a greater degree than other proposed routes, reasonably minimize adverse impact on the scenic and environmental assets of the area.
Appellants contend that all the Commission was empowered to do was to find that the route proposed by Appalachian would or would not create an unreasonable impact on the environment, and then either approve or disapprove that route. They say that neither the minimum impact route nor the optimum route is required. We cannot agree that the role of the Commission under Code § 56-46.1 is so limited or restricted. It is a matter of common knowledge that to decide wisely one must usually have alternative choices. The statute itself is explicit. It affords the Commission licensing flexibility. It requires the establishment of conditions to minimize environmental impact which the Commission has done by its adoption of guidelines promulgated by the Federal Power Commission. The approval of a route for a transmission line is required in addition to construction guidelines which must be observed by a utility regardless of the route such line might follow. Before the Commission can approve a route it must determine that the route the line is to follow will reasonably minimize adverse impact on the scenic and environmental assets of the area concerned. Among the definitions of the word "determine" found in Webster's Third New International Dictionary 616 (1966), are "to fix conclusively or authoritatively... to settle a question or controversy about. . . to come to a decision concerning as the result of the investigation or reasoning. . . to settle or decide by choice of alternatives or possibilities...". "Minimize" is defined in Webster's at 1438 as "to reduce to the smallest possible number, degree, or extent... to estimate in the least possible terms, number, or proportion...".
The responsibility of the Commission cannot be discharged in a vacuum. The statute does not put the Commission in a *926 strait-jacket of either approving or disapproving the location proposed by an applicant. Such a course would be cumbersome and timeconsuming. It would result in a utility repeatedly having to make application until it finally proposed a route which the Commission would approve. The procedure followed by the Commission fully complied with the letter and philosophy of the statute. It approved a route from numerous alternatives, including one which it had suggested be studied and investigated by Appalachian. This does not constitute "site locating". Appalachian could have insisted that its proposed Ivy Creek route be approved. Had the Commission denied its application contrary to the evidence, Appalachian would have been entitled to relief from this court. While the company continues to favor the Ivy Creek route, it concedes that the testimony is in conflict, and now seeks affirmation of the Commission's order approving the Joshua Creek route. The question remains whether the evidence supports the Commission's approval.
Appellants contend that the Joshua Creek route is 18½ miles longer than the Ivy Creek route, necessitating an additional cost of $5.3 million, and the additional usage of some 448.5 acres. They also point out that the Joshua Creek route crosses four major highways while the Ivy Creek route crosses none, and the Joshua Creek route is closer to every major airport in the area than the route first suggested. They say that the change of routes only shifted the emphasis from one set of historical and conservational values to another equally visible set.
The Commission gave great consideration to the closer proximity of the Ivy Creek route to the Peaks of Otter, an area which had been designated by the state as a critical environmental area because of its uniqueness, its historical character and its visual quality. Robert S. DeMauri, of Virginia's Division of State Planning and Community Affairs, testified that a route located 5 to 10 miles south of the route first proposed by the company would be more desirable. The Commission says that the Joshua Creek route is so located. The Ivy Creek route traversed the Bedford historic corridor, and many historic places in that county were located within a few miles of that route. From the record it appears that this route would pass within 1,000 feet of one registered historic site and within 2 miles of three others. The Joshua Creek route passes 1.7 miles from one registered historic site, with no others within 3.5 miles. The Commission found that the Ivy Creek route traverses 25.1 miles of critical environmental areas whereas the Joshua Creek route, although longer, crosses only 18.8 miles of such areas. The Commission also found that the location of the line along the Joshua Creek route would present no hazard to aviation and points to a letter from the Federal Aviation Administration to the effect that "The proposed line would not exceed FAA obstruction standards and would not be a hazard to air navigation."
The Commission concedes that the Joshua Creek route affects more people, is longer and will require the expenditure of more funds than would have been required by the plans submitted by Appalachian. However, its judgment is that the total public interest, giving proper weight to economic and environmental factors, reliability of electric service, land use, safety and engineering feasibility, will be best served by the Joshua Creek route. It points out that a substation on the east side of Lynchburg will permit future interconnection with the VEPCO system at the appropriate time, and that with such a substation Appalachian can more readily construct its proposed future 765 kv line to the Danville area. It further found that the effect of its decision avoids the encirclement of Lynchburg with high powered transmission lines which could have occurred had the Ivy Creek route been approved, a possibility vigorously protested by that city.
We have given careful consideration to all of appellant's assignments of error and *927 to the record which contains 2594 pages, 123 exhibits and the testimony of 70 witnesses. It suffices to say that Appalachian's application to construct the transmission line involved here and the various alternative route proposals for the line have been stoutly contested. There have been many intervenors. The original intervenors challenged the need for and the safety of the line. After need was established, they contested the Ivy Creek route. The Campbell County intervenors, consisting of citizens from both Bedford and Campbell affected by the Joshua Creek route, entered the proceeding after need had been established to the Commission's satisfaction and after the Joshua Creek route had been investigated.
The law which controls our decision here has been too long and too well settled to require the citation of authorities. An order of the State Corporation Commission comes to this court with a presumption of correctness. The Constitution of Virginia and statutes enacted by the General Assembly thereunder give the Commission broad, general and extensive powers in the control and regulation of a public service corporation. The Commission is charged with the responsibility of finding the facts and making a judgment. This court is neither at liberty to substitute its judgment in matters within the province of the Commission nor to overrule the Commission's finding of fact unless we can say its determination is contrary to the evidence or without evidence to support it. The comprehensive record here shows that the Commission fully complied with a statute under which it was acting for the first time and that it examined carefully the need for and the effect of the use of a 765 kv transmission line instead of lower voltage lines. Much of the testimony that was introduced is controverted. However, all findings of fact by the Commission that we consider material to the question of need, and pertinent to environmental considerations, are supported by credible testimony. We therefore affirm its order.
Affirmed.
NOTES
[1] In this order the Commission dismissed the two southern alternative routes and authorized Appalachian to begin construction of the first 10.4 miles of the proposed 765 kv line because both routes remaining under investigation followed a common course for that distance.
[2] During these hearings counsel appeared for Appalachian, Central Virginia Environmental League, Lynchburg Environmental Group, City of Lynchburg, WLVA, Inc., Bedford Historical Society, Friends of Environment, People of Campbell County, the Attorney General of Virginia and the State Corporation Commission.