PRESENT: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Russell, S.J.

CITY OF ALEXANDRIA, ET AL.

v. Record No. 171428

OPINION BY
JUSTICE D. ARTHUR KELSEY
AUGUST 30, 2018

STATE CORPORATION COMMISSION, ET AL.

FROM THE STATE CORPORATION COMMISSION

The City of Alexandria and the City of Hopewell ("Cities") appeal from an order of the State Corporation Commission ("SCC" or "Commission") that approved a new surcharge for Virginia-American Water Company ("VAWC" or "Company"). On appeal, the Cities argue that the SCC had no statutory authority to approve the new surcharge and that, even if it did, the evidence was insufficient to justify the SCC's approval. We disagree on both counts and affirm.

I.

A. VAWC'S RATE APPLICATION

In 2014, VAWC and two other water utilities filed a petition requesting that the SCC establish rules pursuant to which a water utility could apply for the establishment of a water and wastewater infrastructure surcharge ("WWISC"). The City of Alexandria participated in that proceeding. *See Virginia Am. Water Co.*, Case No. PUE-2014-00066, 2015 Va. PUC LEXIS 668, at *2 (S.C.C. Sept. 9, 2015) ("Rulemaking Order").

The SCC decided not to implement the requested rule, but stated in its Rulemaking Order that "the need for such investment, along with the appropriate recovery thereof, can be reasonably addressed on a case-by-case basis wherein the Commission and interested parties may consider the specific circumstances attendant to each utility." *Id.* at *6-7. In reaching this

conclusion, the SCC stated that it was not ruling on the "appropriateness of various rate design mechanisms that may be utilized in association with new infrastructure investment." *Id.* at *7.

In 2015, VAWC filed an application with the SCC for a general increase in water rates. VAWC requested a rate increase, claiming increased capital investment costs, decreased water sales, and a diminished rate of return on common equity ("ROE"). VAWC sought to increase rates to produce an additional $8.69 million of revenue, representing an 18.42% increase in test-year revenues based on a 10.75% ROE. The proposed increase would be divided among VAWC's five operating districts, effective April 1, 2016.[1]

In its application, VAWC also sought approval and implementation of a WWISC to allow VAWC to better plan for and timely recover costs of necessary investment in replacing aging infrastructure and other investments in its system that do not generate additional revenue.

B. THE SCC RECORD

1. VAWC's Evidence

A hearing examiner convened a public hearing to receive evidence on VAWC's application. Along with several other entities, the Cities participated fully in the hearing. The record shows that VAWC owns and operates "a water distribution system consisting of approximately 734 miles of water main, ranging in size from under two to 36 inches, as well as services, meters, hydrants, water treatment plants, pumping stations, storage tanks and water testing equipment." 3 J.A. at 1306. VAWC also "owns, operates and maintains a wastewater system consisting primarily of approximately 181 miles of sewer main, 101 miles of sewer laterals[,] and wastewater treatment plants." *Id.* at 1306-07.

---

[1] The Commission authorized VAWC to implement the WWISC "as set forth in" the Commission's order and dismissed the case. *See In re Virginia-Am. Water Co.*, Case No. PUR-2017-00149 (S.C.C. Mar. 13, 2018); *see also* Appellee's Br. (SCC) at 4 n.1.

VAWC organized its water and wastewater systems into five operating districts: The "Alexandria District serves the City of Alexandria and parts of Fairfax . . . and Arlington Count[ies]." *Id.* at 1307. The "Hopewell District serves the City of Hopewell, and parts of Prince George County." *Id.* The "Eastern District serves 18 subdivisions through 18 distinct public water systems in" Westmoreland, Northumberland, Lancaster, Essex, and King William Counties. *Id.* The Prince William water and wastewater districts serve "the Dale City community in Prince William County." *Id.*

VAWC constructed its systems over time with different types of materials. Older water systems, like the one in Alexandria started in 1850, include "very old pit-cast pipe, centrifugal cast iron pipe, cast iron cement lined pipe, asbestos cement pipe, PVC, reinforced concrete and ductile iron pipe." *Id.* at 1283. "Ductile iron pipe is a newer" and more flexible "pipe material that VAWC started to install around 1970." *Id.* Given its relative inflexibility, "the older cast iron pipe" corrodes over time and "fails more often." *Id.* A significant portion of VAWC's water and wastewater infrastructure has begun to reach the end of its useful life.

VAWC's engineering manager testified that, although VAWC "has made and continues to make investments in" replacing aging infrastructure, "the amount of main replaced cannot keep up with the amount of main requiring replacement in the coming decades." *Id.* at 1294. VAWC's "mains that have been installed over the past 115 years will need to be replaced over the next 85 years to ensure that the system is" properly maintained. *Id.* at 1295. At the current rate, "the estimated time frame for total replacement of [the Company's] mains is over 430 years, or 345 years longer than the average life expectancy of these facilities." *Id.* at 1296. The engineering manager opined that, if the SCC approved the WWISC, VAWC's capital replacement program would "operate more effectively" and would likely avoid "the additional

3

costs associated with infrastructure failures or main breaks." *Id.* at 1301. He also stated that the WWISC would fund the total main replacement plan and reduce its duration "to an average of 139 years," with the "long-term goal . . . to reduce the time frame for total replacement to 100 years." *Id.* at 1296.

Another engineering manager for VAWC pointed out that "VAWC's water main replacement rate for 2014 was 0.32%." *Id.* at 1283-84. At that rate, "the average pipe in VAWC's network would have to continue in service for nearly 300 years." *Id.* at 1284. The first engineering manager explained further that VAWC planned to focus "its replacement efforts in the Alexandria and Eastern Districts." *Id.* at 1298. Alexandria in particular "has the largest inventory of cast iron pipe in need of replacement," "a significant inventory of pipe" six inches or less in diameter, and "the highest average main break frequency rate of all the Districts with 33 breaks per 100 miles of pipe." *Id.* "In Alexandria, 63% of mains are cast iron," and these "mains account for 94% of the main breaks in that District." *Id.*

VAWC's president testified that "the major drivers of the Company's need for rate relief" in this case were VAWC's "ongoing capital investment" in infrastructure and "revenue loss arising from declining [water] usage." *Id.* at 1117. He said that VAWC had increased its utility plant investment by $53 million "since the last general rate case" and had continued to make investment in infrastructure. *Id.* VAWC needed the WWISC, he contended, to replace aging infrastructure on an accelerated basis and reach a "100-year main replacement schedule" — "or 1% annually" — which would permit VAWC to timely recover the costs of these non-revenue producing investments.[2] *Id.* at 1129.

---

[2] The SCC last approved VAWC's base rates on December 12, 2012, "based on a test year ended September 30, 2011." 3 J.A. at 1115.

4

A manager in VAWC's Mid-Atlantic Division explained that a utility typically must file a general rate case to recover its investment in replacing aging infrastructure but "may only include investment that is 'reasonably predicted to occur' through the end of the rate year." *Id.* at 1198. He explained that this approach created a "limited and insufficient horizon for replacement of aging infrastructure." *Id.* VAWC considered infrastructure replacement to be a non-revenue producing investment "because it [did] not add additional customers" or "increase sales." *Id.* at 1199. He stated that VAWC proposed the WWISC because of this "regulatory lag" present in the traditional ratemaking process. 4 *id.* at 1924.[3]

The division manager further opined that the WWISC would accelerate infrastructure replacement in a more orderly way and increase capital infusion while mitigating against periodic spikes in the base rate. Otherwise, timely recovery for infrastructure improvements would require filing more base-rate cases, which "would result in larger and more frequent base rate increases" if they were successful. 3 *id.* at 1238-39. But a WWISC would "allow the Company to better plan for, more consistently fund, and more gradually incorporate into customers' bills, the costs associated with these types of investment." *Id.* at 1239. Under VAWC's requested WWISC, the SCC would have to approve the initial charge and any adjustments to the charge, could not already be included in the calculation of the company's base rates, and would relate only to non-revenue-producing infrastructure. *See id.* at 1201-03. The proposed WWISC could also include conditions safeguarding the public interest such as SCC

---

[3] *See generally* William T. Reisinger, *Public Utilities Law*, 49 U. Rich. L. Rev 137, 148 (2014) (stating that "[r]egulatory lag" refers to "the time period between when a utility first makes an investment (such as when it starts construction of a power plant) and when the utility may begin to recover those costs through rates").

approval of annual updates to the rate, audits, and annual reconciliation of the difference between revenues and costs. *Id.*

The division manager projected that the Company would spend $44,508,091 in necessary expenditures for "WWISC-eligible infrastructure" between 2017 and 2020. *Id.* at 1236. Of that amount, the Company would spend $28,543,600 to replace water and wastewater distribution mains. *See id.* Compared to the period from 2012 to 2015, these expenditures represented a 46% increase in capital investment for WWISC-eligible infrastructure and a 98% increase in planned replacement of distribution mains. *Id.* Based on "the projected calendar-year 2017 WWISC-expenditure levels, the typical residential monthly customer bill" for all districts would increase "on average by $0.44." *Id.* at 1251. The projected average increase for the Alexandria District was $0.43 per month. *See id.* at 1260.

### 2. The Opposition's Evidence

The City of Alexandria's energy manager testified that Alexandria did not take issue with VAWC's efforts to replace infrastructure. *See id.* at 1395. But the WWISC was unnecessary, he maintained, because VAWC "has the ability to successfully invest in infrastructure replacement while . . . achieving appropriate returns" by filing a base-rate case. *Id.*; *see also* 2 *id.* at 814 ("[VAWC] does have alternative methods currently available to them to invest in such infrastructure."). He described the WWISC request as "fraught with issues and questionable public protections" as well as "hasty and gratuitous." 3 *id.* at 1395.

A hired consultant agreed, opining that the current ratemaking process sufficiently addressed the need for accelerated infrastructure replacement. *See id.* at 1416. He stated that "[o]ne way the current ratemaking process permits infrastructure replacement is through depreciation of existing plant in service." *Id.* Under this approach, "depreciation expense

6

collected through base rates can be invested in new plant without having any impact on the utility's overall revenue requirement." *Id.* He also said that other existing ratemaking mechanisms already addressed the need to replace aging infrastructure. *See id.* at 1417.

The consultant criticized VAWC's proposed customer safeguards as inadequate. *See id.* at 1420. He pointed to the lack of an Earnings Test, which he considered "crucial" in order to match actual WWISC-rate expenditures during a defined period with the estimates used to determine the WWISC. In addition, he maintained that a "true up" was necessary to prevent VAWC from earning beyond its allowed return. *Id.* at 1422. He argued further that the proposed WWISC would require ratepayers to pay for future improvements and infrastructure replacements, and that VAWC had "no incentive . . . to control its costs." *Id.* at 1423. He opined that "[t]raditional ratemaking always has and always will best serve the public interest," not single-issue ratemaking. *Id.* at 1425.

Two other consultants testified in opposition to the proposed WWISC, who were both experts in the field of public-utility regulation. They considered the WWISC to be unnecessary to accomplish VAWC's goals. They contended that VAWC "has not been earning substantially less than its authorized [ROE]," *id.* at 1506, that it has not "experienced exceptional growth in rate base" (with an annual growth rate of about 4%), *id.*, and that it has not "show[n] that its planned capital expenditures for eligible infrastructure investment will result in rate base growth that [could not] be supported under the traditional ratemaking practices," *id.* at 1508. One of the consultants testified that "the $200,000 per year of new wastewater infrastructure spending is less than" VAWC's "annual depreciation expense of $1.842 million," that "[c]ontinuing annual accruals of depreciation expense increase Accumulated Depreciation," and that if "the annual change in Accumulated Depreciation equals or exceeds the change in Plant in Service, there is no

7

net increase in rate base." *Id.* at 1662. Whether VAWC truly needed a WWISC for infrastructure replacement was "highly questionable." *Id.* Both consultants suggested various consumer safeguards if the SCC ultimately approved the WWISC.[4]

### 3. The SCC Staff's Evidence

A principal utilities analyst in the SCC's Division of Energy Regulation did not make a recommendation for approval of the WWISC, but he did suggest how to implement the WWISC if approved.[5] A deputy director with the Division of Utility Accounting and Finance also reviewed the proposed WWISC and recommended various safeguards, including an annual Earnings Test, if the WWISC were approved. He agreed that the WWISC would help to accomplish VAWC's goals of continuing improvement, safety, and reliability for its distribution system "[t]o the extent [the WWISC] accelerates replacement of infrastructure and the needed replacement." 2 *id.* at 1021-22. He also concurred in the view that an acceleration of the replacement rate "seems reasonable." *Id.* at 1026-27.

### 4. The Hearing Examiner's Report

After receiving briefs, the Hearing Examiner found "that a three-year pilot WWISC should be approved for [VAWC's] Alexandria District subject to" certain safeguards and

---

[4] The consultants' recommendations included that there should be an Earnings Test, 4 J.A. at 1649-50; that there should be a cap on charges at 5%–7.5% of the base rate, *id.* at 1678; that the WWISC "should be narrowly and specifically tailored to address the specific need to replace . . . water utility infrastructure," *id.* at 1675; that certain accounting measures should be used, *id.* at 1678-79; that the WWISC should be implemented "as a pilot program that is restricted to the Alexandra district," *id.* at 1679; that "[t]he WWISC charge should be separated between water service and wastewater service," 3 *id.* at 1489; and that the WWISC "should be implemented on a district-specific basis," *id.*

[5] The utilities analyst specifically recommended the filing of "separate rate schedules for water [and wastewater] by district . . . for the length of the WWISC," *id.* at 1472; that "both components of the WWISC . . . should be allocated to each one of the Company's rate schedules in conformance with the revenue allocation by schedule approved by the Commission," *id.*; and that certain language "be removed from the proposed tariff," *id.* at 1473.

limitations. 1 *id.* at 516. He concluded that the SCC had statutory authority to approve the WWISC and that VAWC's infrastructure-replacement needs justified the imposition of the WWISC. *See id.* at 518. He noted that infrastructure replacement does not generate revenue, that the WWISC could provide an "ongoing revenue stream" as opposed to "the stop-start regime that currently exists," that it is "expensive" to file base-rate cases, and that the SCC would not be deprived of oversight of the rate increases. *Id.* He recommended 12 safeguards as conditions for the imposition of the WWISC:

- "The WWISC should be limited to mains and main related infrastructure in the Alexandria District."

- "The WWISC should be approved for" only a three-year period after which "it may be ended, expanded, or otherwise modified."

- "The use of an Earnings Test should accompany the annual WWISC review, and to the extent WWISC collections result in annual earnings above the mid-point of [VAWC's] authorized range of ROE, a refund should be made to ratepayers, with interest."

- "The WWISC should not be approved as an automatic rate adjustment clause."

- "[A]nnual updates to the WWISC Rider and [its] amendments to the WWISC Plan should occur in docketed proceedings."

- "The annual filing should occur 120 days prior to the requested rate effective date."

- The SCC "Staff's tariff revisions" — "except as modified" in the Hearing Examiner's Report — as well as the "revisions to the calculation of the WWISC" appearing in the Hearing Examiner's Report, "should be adopted."

- "Detailed accounting information as required by [SCC] Staff should accompany the annual WWISC filings," and the SCC "should have the discretion to rule any annual WWISC filing [to be] incomplete."

- "Currently approved depreciation rates should be used in WWISC calculations."

- "The calculation of carrying charges should be based on a series of two-month averages over-or under-recovery balances."

9

- SCC "Staff should have access to the internal analysis [that VAWC] performs in the evaluation of contractor bids for [WWISC-eligible] projects."

*Id.* at 519.

The Hearing Examiner further found that the WWISC revenues should not exceed 7.5% of the Alexandria District's aggregate revenues. *See id.* With a 7.5% cap on "the amount billed to customers under otherwise applicable rates and charges," 3 *id.* at 1242, "the typical residential customer's [monthly] bill [will] increase, on average, by $0.32," *id.* "Until th[e] cap is reached" — that is, "while the program is ramping up," "which could take a year or more" — "the actual bill impact [will] be much less." 1 *id.* at 520. "This is a small price to pay for much needed infrastructure improvements that will not only improve customers' service, but service reliability as well," the Hearing Examiner determined. *Id.* He concluded with the observation that "[t]he need to accelerate the rebuilding of the Company's distribution infrastructure is essential to meet the ongoing needs of the community and customers and to maintain system reliability." *Id.*

## 5. The Commission's Final Order

In its final order, the Commission agreed with the Hearing Examiner's report recommending a three-year pilot plan for a WWISC applicable to the Alexandria District, subject only to "the safeguards and limitations . . . as modified" by the Commission. *Id.* at 651. The Commission authorized VAWC "to file an application on or after June 1, 2017, to institute [the] WWISC, as set forth" in the final order. *Id.* at 652.

The Commission emphasized that "the use of an Earnings Test should accompany the annual WWISC review" and found "that refunds should be made to ratepayers, with interest, to the extent WWISC collections result in annual earnings above the rate of return on common equity of 9.25% approved." *Id.* Under the Earnings Test, the SCC would calculate test-year

10

earnings every year that the WWISC would be in place. *See* 2 *id.* at 1003. VAWC would be required to issue a refund to ratepayers, with interest, if the SCC found that "WWISC collections result[ed] in annual earnings above the mid-point of the Company's authorized range of return on common equity." 4 *id.* at 1828. The Earnings Test would not be used to "reestablish" future base rates. 2 *id.* at 1003.

## II.

The Cities appeal to us, arguing that the SCC has no statutory authority to approve the WWISC and, in the alternative, that the evidence was factually insufficient to justify the approval of the WWISC. The SCC and the VAWC disagree, arguing that the SCC has broad discretion to approve the WWISC, that the SCC's discretion may only be limited expressly by statute, and that there is sufficient evidence to uphold the SCC's approval. We agree with the VAWC and the SCC and hold that the SCC has the statutory authority to approve the WWISC. We also conclude that sufficient evidence in the record supports the Commission's finding that the rate is "just and reasonable" under Code § 56-235.2.

### A. STANDARD OF APPELLATE REVIEW

"[T]he standard of review applied to a Commission decision 'will depend on the nature of the decision under review.'" *Office of the Att'y Gen. v. State Corp. Comm'n*, 288 Va. 183, 191, 762 S.E.2d 774, 778 (2014) (citation omitted). As we have often said, "the Commission's decision is entitled to the respect due judgments of a tribunal informed by experience." *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 735-36, 735 S.E.2d 684, 688 (2012) (citation omitted). Even so, we review questions of law de novo. *See Virginia Elec. & Power Co. v. State Corp. Comm'n*, 295 Va. 256, 262, 810 S.E.2d 880, 883 (2018). Although the SCC's statutory construction "is entitled to the respect due judgments of a tribunal informed by

11

experience," *id.* at 263, 810 S.E.2d at 883 (citation omitted), we are "not inextricably bound" by it and "will not hesitate to reverse" it if we find that it "is based on a mistake of law," *BASF Corp. v. State Corp. Comm'n*, 289 Va. 375, 403, 770 S.E.2d 458, 473 (2015).

A different paradigm governs the SCC's findings of fact. We may not "overrule the Commission's findings of fact unless . . . its determination is contrary to the evidence or without evidence to support it." *Virginia Elec. & Power Co.*, 284 Va. at 735, 735 S.E.2d at 688; *Board of Supervisors of Campbell Cty. v. Appalachian Power Co.*, 216 Va. 93, 105, 215 S.E.2d. 918, 927 (1975). In this context, we only ask whether a rational factfinder could have interpreted the historical facts, accompanied by reasonable inferences therefrom, in a way supportive of and consistent with the SCC's conclusions.

We also recognize that we are not "at liberty to substitute [our] judgment [for that of the Commission] in matters within the province of the Commission." *Virginia Elec. & Power Co.*, 284 Va. at 735, 735 S.E.2d at 688. That is particularly true with regard to the SCC's ratemaking authority because in that context the SCC "is exercising a legislative function delegated to it by the General Assembly." *Old Dominion Comm. for Fair Util. Rates v. State Corp. Comm'n*, 294 Va. 168, 180, 803 S.E.2d 758, 764 (2017) (citation omitted). We thus "presume that where the General Assembly has not placed an express limitation in a statutory grant of authority, it intended for the Commission, as an expert body, to exercise sound discretion." *Virginia Elec. & Power Co.*, 284 Va. at 741, 735 S.E.2d at 691.

## B. STATUTORY AUTHORITY TO APPROVE THE WWISC

On appeal, the Cities "vehemently disagree" that the SCC has statutory authority to approve the proposed WWISC. Appellants' Br. at 12. We do not understand the basis for such vehemence. Both the Constitution of Virginia and the enabling statutes enacted by the General

12

Assembly are written in purposefully broad terms. While arguably controversial, the SCC's approval of the WWISC does not offend any provision of the Constitution or the Code of Virginia.

### 1. Governing Constitutional and Statutory Provisions

The Constitution of Virginia authorizes the SCC to regulate "rates, charges, and services and . . . facilities of railroad, telephone, gas, and electric companies." Va. Const. art. IX, § 2. Although water companies are not explicitly mentioned, Article IX, Section 2 further states, "[t]he Commission shall have such other powers and duties not inconsistent with this Constitution as may be prescribed by law." *Id.*

Code § 12.1-12 confers on the SCC the power and duty to "regulat[e] the rates, charges, services, and facilities of all public service companies as defined in [Code] § 56-1," which includes water supply companies and wastewater companies, "[s]ubject to such criteria and other requirements as may be prescribed by law." *See also* Code § 56-35. "When the rate of return has been determined, the Commission exercises primarily an administrative duty in deciding where, how, and from what source or sources the increased revenue awarded is to be obtained." *Anheuser-Busch Cos. v. Virginia Nat. Gas, Inc.*, 244 Va. 44, 47, 418 S.E.2d 857, 859 (1992).

Code § 56-235, which sets out the SCC's general ratemaking authority, provides in relevant part:

> If upon investigation the rates, tolls, charges, schedules, or joint rates of any public utility[, including water or wastewater companies, *see* Code § 56-232(A)(1),] operating in this Commonwealth shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or to be preferential or otherwise in violation of any of the provisions of law, *the State Corporation Commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just and reasonable*. All rates, tolls, charges or

schedules set by the Commission shall be valid only if they are in full conformance with the provisions of this chapter.

(Emphasis added.) Code § 56-235.2 states in relevant part:

> A. *Any rate, toll, charge or schedule* of any public utility operating in this Commonwealth shall be considered to be just and reasonable only if: (1) the public utility has *demonstrated that such rates, tolls, charges or schedules in the aggregate* provide revenues not in excess of the aggregate actual costs incurred by the public utility in serving customers within the jurisdiction of the Commission, including such normalization for nonrecurring costs and annualized adjustments for future costs as the Commission finds reasonably can be predicted to occur during the rate year, and a fair return on the public utility's rate base used to serve those jurisdictional customers . . . . Notwithstanding [Code] § 56-234, *the Commission may approve, either in the context of or apart from a rate proceeding after notice to all affected parties and hearing, special rates, contracts or incentives to individual customers or classes of customers where it finds such measures are in the public interest. . . .*
>
> B. The Commission shall, before approving *special rates*, contracts, incentives or other alternative regulatory plans under subsection A, ensure that such action (i) protects the public interest, [and] (ii) will not unreasonably prejudice or disadvantage any customer or class of customers . . . .
>
> C. After notice and public hearing, the Commission shall issue guidelines for *special rates* adopted pursuant to subsection A that will ensure that other customers are not caused to bear increased rates as a result of such special rates.

(Emphases added.)

These broadly written statutes authorize the SCC to set just and reasonable rates for public utilities, including water and wastewater companies, without limitation as to the type of rate mechanism set. Code § 56-235.2(A) requires only that when the SCC sets any rate, it must be satisfied that the utility has demonstrated that aggregate revenues earned will not exceed aggregate costs, plus a fair return.

14

2.  Explicit Authorization for Rate Change

The Cities acknowledge the SCC's delegated ratemaking power but argue that, even so, the SCC's approval of the WWISC in this case cannot satisfy even the minimal statutory requirements. Under their view, it is essential that "future improvements to infrastructure be included *as a component* considered by the Commission in approving a public utility company's proposed rates." Appellants' Br. at 14 (emphasis in original). The SCC erred in approving the WWISC, the Cities argue, because the WWISC "program *only* considers infrastructure costs and does not consider returns on investment or profit to be derived from system improvements." *Id.* (emphasis added).

In other words, the Cities reason that the WWISC takes into account "only the cost of replacement of a water main, but not the additional profits that might be obtained from that replacement due to elimination of inflow and infiltration, and ignores potential new customers or profits from replacement of smaller, older lines with larger mains carrying more water volume." *Id.* at 15. Based upon this reasoning, the Cities conclude, the SCC has no "statutory authority for this infrastructure cost recovery program outside of a regular rate case." *Id.* at 17.

Embedded in this argument is a valid concern. If the SCC approved a rate while wholly ignoring the decision-making factors required by Code § 56-235.2, we would declare the approval to be ultra vires. In this case, however, the SCC did not ignore the governing statutory factors. VAWC filed this case as a traditional rate case that included each of its five service districts. The VAWC filed its "Application of [VAWC] for a general increase in rates," 1 J.A. at 3 (altering capitalization), requesting an increase in its base rate to recover additional annual revenues of $8.69 million as well as a surcharge to recover additional revenue for accelerated infrastructure replacement costs not included in the base rate. The SCC ultimately approved an increase in the VAWC's base rate to recover additional annual revenues of $5.18 million and a temporary

15

surcharge for the accelerated infrastructure replacement costs applicable to only one of VAWC's five districts.

The SCC's review of the WWISC was not disconnected from its overall discretionary review of VAWC's request for an increase in its base rate. It was an analysis that looked at all of the facts presented in the aggregate and in light of the statutory factors. This is particularly evident in the extensive qualifications that the SCC placed upon the implementation of the WWISC. Perhaps the most significant is the Earnings Test, which takes into account all of the Alexandria District's revenues from base rates and from the WWISC to determine if VAWC earned more than its approved rate of return for that district. Other qualifications — the 7.5% cap and the three-year period for the pilot WWISC, the mechanism for customer refunds, and the requirement of SCC approval for annual updates to the rate — further reinforce the SCC's attention to the required statutory factors.

### 3. Adjustment Clauses

We find nothing legally unprecedented about the SCC's approval of the WWISC. To be sure, we have upheld analogous clauses in other contexts. In *City of Norfolk v. Virginia Electric and Power Co.*, a municipality challenged an "escalator clause" in a natural gas provider's rate schedule. 197 Va. 505, 506-07, 90 S.E.2d 140, 141 (1955). The clause calibrated the rate to the fluctuating costs of natural gas. Under the clause, "[t]he consumers of gas [were] required to pay the increase in the cost of gas, if an increase occur[ed], and they [were] given the benefit of a decrease in such cost when a decrease occur[ed]." *Id.* at 513, 90 S.E.2d at 146. Consequently,

> [t]he proposed escalator clause [was] nothing more or less than a fixed rule under which future rates to be charged the public [were] determined. It [was] simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates.

16

*Id.* at 516, 90 S.E.2d at 148. *See generally* 2 William A. Mogel, Regulation of the Gas Industry § 40.06[1] (2017) ("This type of ratemaking mechanism allows the rate approved by the regulators to fluctuate in relation to changes in the expense categories and/or business factors covered by the clauses."). We held that the SCC "had the authority to approve the escalator clause . . . and to authorize its insertion in the schedules of rates, charges, rules and regulations of the Company." *City of Norfolk*, 197 Va. at 519, 90 S.E.2d at 150. We concluded "that in its operation the escalator clause violates no constitutional or statutory limitations." *Id.*

We also addressed an "automatic adjustment clause" in *Old Dominion Power Co. v. State Corporation Commission*, 228 Va. 528, 323 S.E.2d 123 (1984). In that case, an electric utility requested the clause to protect against "future changes in the price its parent charges it for purchased power." *Id.* at 532, 323 S.E.2d at 125. The SCC denied the request. We assumed, as the electric utility had conceded, that the SCC's decision to grant or deny requests of this nature fell "within the Commission's discretion." *Id.* And we held that such decisions would "be upheld if they bear some rational relationship to a legitimate interest or purpose." *Id.* at 534, 323 S.E.2d at 127.[6]

---

[6] The SCC has regularly exercised its authority in cases involving automatic adjustment clauses. *See, e.g.*, *Washington Gas Light Co.*, 2017 S.C.C. Ann. Rept. 314, 315 (2017) (ordering the adoption of a revised stipulation, which provided for a purchase gas cost mechanism and an annual cost adjustment mechanism); *Columbia Gas of Va., Inc.*, 2012 S.C.C. Ann. Rept. 337, 337 (2012) (denying the company's request to allocate refunds outside of the automatic adjustment mechanism in place); *Atmos Energy Corp.*, 2005 S.C.C. Ann. Rept. 322, 322-23 (2005) (granting the company's request for a weather normalization adjustment charge); *Shenandoah Gas Co.*, 1996 S.C.C. Ann. Rept. 318, 318-19 (1996) (granting the company's request to suspend the actual cost adjustment clause of a purchased gas adjustment provision); *State Corp. Comm'n*, 1988 S.C.C. Ann. Rept. 333, 333, 337 (1988) (incorporating the recommendations of SCC Staff regarding the SCC's purchase gas adjustment policies, subject to certain modifications) ; *State Corp. Comm'n v. Roanoke Gas Co.*, 1982 S.C.C. Ann. Rept. 568, 571 (1982) (ordering the company to issue refunds in accordance with the terms of its purchased gas adjustment provisions).

## 4. The SAVE Act

Finally, the Cities compare the SCC's statutory authority in this case to the SCC's statutory authority to approve rate-adjustment clauses in its regulation of natural gas companies under the Steps to Advance Virginia's Energy Plan Act, Code §§ 56-603 to -604 (the "SAVE Act"). Because the Constitution of Virginia expressly authorizes SCC-regulation of natural gas companies and because "the natural gas utilities sought legislation to implement the SAVE Act," Appellants' Br. at 18, the SCC necessarily lacked the authority "to implement a natural gas infrastructure replacement charge," *id.* at 20. Therefore, "in order for water and wastewater companies — which are not set forth in the [Constitution of] Virginia . . . — to implement a WWISC, legislation is certainly required." *Id.* at 18. Furthermore, the Constitution of Virginia expressly authorizes SCC-regulation of "railroads, telephone, gas and electric companies" but authorizes SCC-regulation of other entities only when the SCC is exercising "powers and duties not inconsistent with this Constitution as may be prescribed by law." Va. Const. art. IX, § 2.

This interpretative inference does not apply here for several reasons. Express statutory authorization on one specific subject may sometimes imply the absence of authorization on another analogous subject. *See generally Du v. Commonwealth*, 292 Va. 555, 565 n.7, 790 S.E.2d 493, 500 n.7 (2016). But as we observed earlier, the SCC's authority to approve rate-adjustment clauses comes from several broadly worded statutes that delegate discretionary power to the SCC. *See, e.g.*, Code § 12.1-12; *id.* § 56-35; *id.* § 56-235; *id.* § 56-235.2. "[W]hen a statute delegates such authority to the Commission, we presume that any limitation on the Commission's discretionary authority by the General Assembly will be clearly expressed in the language of the statute." *Virginia Elec. & Power Co.*, 284 Va. at 741, 735 S.E.2d at 691. Only the presence of such "clearly expressed" statutory language, *id.*, can limit a general statutory grant of authority. The presence of

statutory grants of power in analogous contexts raises only a silent implication of such a limitation. In other areas of law, that silent implication might be enough. But not here.[7]

Other statutory analogies undermine the Cities' interpretation. The General Assembly has expressly limited the SCC's ratemaking discretion by enacting specific requirements for the approval of rate-adjustment clauses in several regulatory contexts. *See, e.g.*, Code § 56-585.1(A)(5)(c) (providing for a rate adjustment clause "to design, implement, and operate energy efficiency programs" only if "the program is in the public interest"); *id.* § 56-585.1(A)(5)(e) (providing for a rate adjustment clause to cover costs necessary to ensure compliance "with state or federal environmental laws or regulations"); *id.* § 56-585.1(A)(5)(f) (providing for a rate adjustment clause "to design, implement, and operate programs that . . . accelerate the vegetation management of distribution rights-of-way"); *id.* § 56-585.1(A)(6) (providing for a rate adjustment clause for new or modified generation facilities "after the expiration or termination of capped rates"); *id.* § 56-249.6 (providing for a rate adjustment clause for electric utility fuel costs under certain conditions). Each of these statutes imposes various procedural and substantive limitations, thus presupposing an underlying general regulatory power.

_____

[7] *See generally* Henry Campbell Black, Handbook on the Construction and Interpretation of the Laws § 72, at 220 (2d ed. 1911) (stating that there are circumstances in which "the legislature [does] not in fact intend that its express mention of one thing should operate as an exclusion of all others" such that "the maxim must give way"); Reed Dickerson, The Interpretation and Application of Statutes 234-35 (1975) (stating that the application of the negative-implication canon "depends on the particular circumstances of context"); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012) ("Virtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context."); 2A Norman J. Singer & Shambie Singer, Sutherland's Statutes and Statutory Construction § 47:3, at 423 (7th rev. ed. 2014) (stating that "expressio unius is a rule of statutory construction and not a rule of law," and as such "is subordinate to the primary rule that legislative intent governs the interpretation of a statute").

This reasoning also applies to the SAVE Act because it too imposes various limitations on the SCC's discretionary authority to approve rate-adjustment clauses for natural gas infrastructure. *See* Code §§ 56-603 to -604. The General Assembly enacted the statute in 2010, half a century after we recognized the SCC's authority to approve an "escalator clause" that implemented rate adjustments according to the fluctuating costs of natural gas. *See City of Norfolk*, 197 Va. at 516-17, 90 S.E.2d at 148-49. What we said there we repeat here: The general ratemaking "power of the Commission is in no wise limited or restricted by reason of additional powers granted it in other sections of the Code." *Id.* at 515, 90 S.E.2d at 147.

## C. SUFFICIENCY OF THE EVIDENCE

The Cities argue in the alternative that the Commission's findings were contrary to the evidence because VAWC allegedly failed to show the need for the WWISC to accelerate infrastructure investment, as proven by VAWC's ability to implement certain accounting practices or use existing ratemaking mechanisms. "There was *simply no evidence* showing that the WWISC program was needed to serve the public interest," and the SCC "effectively dismiss[ed] substantial expert testimony regarding the lack of necessity for the WWISC." Appellants' Br. at 22-23 (emphasis added); *see also id.* at 26-27.[8]

---

[8] To the extent that the Cities argue that the Company's current request should be rejected because the Commission rejected the need for a WWISC in the Rulemaking Order, *see* Appellants' Br. at 23-24; *see also* Cities' Ex. No. 21 at 9-10 (Testimony of Carl W. Eger III, Energy Manager for the City of Alexandria) (arguing that the WWISC in this base-rate case should be denied because "no material facts have changed since the Commission's Final Order" in that rulemaking case), the Cities' argument fails. Even if the Commission rejected a global request for the WWISC in the Rulemaking Order, that fact does not bear on the Commission's targeted approval of the pilot WWISC here. The Hearing Examiner repeatedly observed that the Commission acknowledged this fact in the Rulemaking Order when it determined that the Commission would decide whether to apply the WWISC on a "case-by-case basis." 1 J.A. at 517 (quoting *Virginia-Am. Water Co.*, 2015 Va. PUC LEXIS 668, at *6).

The SCC correctly asserts, however, that whether "the Commission could have set just and reasonable rates for the Alexandria district without a rate adjustment clause . . . . is not the standard." Appellee's Br. (SCC) at 20. Instead, the question is whether there is sufficient evidence in the record to support the Commission's finding that the proposed WWISC is "just and reasonable" under Code § 56-235.2. *See BASF Corp.*, 289 Va. at 398, 770 S.E.2d at 471 (observing that the Commission's findings are only reversed if they are "contrary to the evidence or without evidentiary support").

The Commission's final order "agree[d] with the Hearing Examiner" and "[found] that a three-year pilot WWISC [should] be approved and implemented for the Alexandria District," subject only to "the safeguards and limitations . . . as modified" by the Commission. 1 J.A. at 651. Experts in support of and in opposition to the WWISC testified to the deterioration of the current infrastructure and the need to replace it. *See* 3 *id.* at 1174; *id.* at 1284; 4 *id.* at 1661-62. VAWC's division manager stated that the Company proposed the WWISC primarily due to the "regulatory lag" in the traditional ratemaking process, 4 *id.* at 1924, and the Hearing Examiner noted that the WWISC could replace "the stop-start regime that currently exists," 1 *id.* at 518.

In support of their argument, the Cities assert that opposing experts showed that certain accounting practices and existing ratemaking mechanisms would adequately support the Company's goals to accelerate the pace of infrastructure replacement. Appellants' Br. at 27-28. They also argue that the VAWC made "admissions regarding its already-existing ability to recover infrastructure costs." *Id.* at 22. But this evidence does little more than show that the parties' experts disagreed, which does not render the Commission's findings contrary to the evidence, *see, e.g.*, *BASF Corp.*, 289 Va. at 397, 770 S.E.2d at 470, and it does not support the argument that the Company produced "simply no evidence," Appellants' Br. at 22.

21

"The Commission [is] entitled to interpret [the] conflicting evidence and to decide the weight to afford it." *Board of Supervisors of Loudoun Cty. v. State Corp. Comm'n*, 292 Va. 444, 458, 790 S.E.2d 460, 467-68 (2016). Thus, the Commission was entitled to afford more weight to testimony that current rates account "only for investment 'reasonably predicted to occur' before and during a utility's rate year," which provides only "a limited and insufficient horizon," 3 J.A. at 1198; that there is a "revenue-recognition lag" or "regulatory lag" under the traditional ratemaking model, *id.* at 1238-39; that filing more base-rate cases "would result in larger and more frequent base rate increases" if they were successful, *id.* at 1239; or that a WWISC would "allow the Company to better plan for, more consistently fund, and more gradually incorporate into customers' bills, the costs associated with these types of investment," *id.*; *see also id.* at 1130 (stating that the WWISC would "moderate future rate increases on customers and facilitate the acceleration of infrastructure investment").

To the extent that the Cities argue that the proposed WWISC fails to meet the "just and reasonable" standard in Code § 56-235.2 because the customer protections are insufficient, *see* Appellants' Br. at 25-26, the Cities' argument is unpersuasive. The WWISC is limited to a three-year period exclusive to the City of Alexandria, and there is a 7.5% cap on the amount billed to customers. The SCC would also approve annual updates to the WWISC in docketed proceedings. Finally, the SCC would conduct an Earnings Test for the annual review of the WWISC so that VAWC will refund ratepayers, "with interest, to the extent WWISC collections result in annual earnings above the rate of return on common equity of 9.25% approved." 1 J.A. at 652.

"In determining the question" whether the Commission's finding that the WWISC is just and reasonable and in the public interest, this Court observes a "highly deferential standard of

review." *BASF Corp.*, 289 Va. at 398, 770 S.E.2d at 471. "[T]he Commission properly considered" the testimony on behalf of all parties and "found substantial evidence showing" the appropriateness of the WWISC. *Board of Supervisors of Campbell Cty.*, 216 Va. at 96-97, 215 S.E.2d at 921. "We cannot sit as a board of revision to substitute our judgment for that of matters within the province of the Commission." *Virginia Gas Distrib'n Corp. v. Washington Gas Light Co.*, 201 Va. 370, 375, 111 S.E.2d 439, 442-43 (1959). In light of this record, "we cannot say the Commission's decision is contrary to the evidence or without evidentiary support." *Appalachian Power Co. v. State Corp. Comm'n*, 284 Va. 695, 710, 733 S.E.2d 250, 258 (2012).

III.

In sum, the SCC possessed statutory authority to approve the WWISC, and the evidence was sufficient to justify its approval. We thus affirm.

*Affirmed.*