PRESENT:  Powell, Kelsey, McCullough, and Chafin, JJ., and Mims, Russell and Millette, S.JJ.

APPALACHIAN POWER COMPANY

v.  Record No. 210391

STATE CORPORATION COMMISSION, ET AL.

OFFICE OF THE ATTORNEY GENERAL,
DIVISION OF CONSUMER COUNSEL, ET AL.

v.  Record No. 210634

STATE CORPORATION COMISSION, ET AL.

OPINION BY
JUSTICE D. ARTHUR KELSEY
AUGUST 18, 2022

FROM THE STATE CORPORATION COMMISSION

Appalachian Power Company ("Appalachian") and the Office of the Attorney General,

Division of Consumer Counsel ("Consumer Counsel"),[1] both challenge different rulings made by

the State Corporation Commission ("Commission") during its triennial review of Appalachian's

rates, terms, and conditions pursuant to Code § 56-585.1.  For the following reasons, we reverse

in part, affirm in part, and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  *Triennial Review*

Under Code § 56-585.1, the Commission is required to conduct a review every three

years[2] of Appalachian's rates, terms, and conditions for providing generation, distribution, and

transmission services.  The Commission must determine Appalachian's earned return for the

---

[1] Consumer Counsel is joined by Sierra Club and the Virginia Poverty Law Center in its appeal, but for the sake of brevity, all appellants in Record No. 210634 will be referenced collectively as "Consumer Counsel" throughout this opinion.

[2] These reviews were previously conducted on a biennial basis, but in 2015, the General Assembly enacted legislation that canceled Appalachian's biennial review scheduled for 2016, froze its rates, and scheduled the next review for 2020, which would cover the years 2017-2019. *See* Code § 56-585.1:1(A).  The years of 2015 and 2016, which were not covered by any review, are referred to as the "transitional-rate period."  Appalachian's last review was in 2014.

three-year period and then compare it to a 140-point band around Appalachian's approved return on equity ("ROE"). Code § 56-585.1(A)(8). If the earnings fall more than 70 points below or above the approved ROE, the Commission must conduct a going-forward rate case to determine how much to adjust rates. If the earnings are more than 70 points below the approved ROE, the Commission must order an increase in the rates to recover the revenue reduction, and if the earnings are more than 70 points above the approved ROE, the Commission must order bill credits for customers. *See* Code § 56-585.1(A)(8)(a)-(b). But if the earnings fall within the 140-point band, the statute dictates that the Commission does not conduct a going-forward rate case and that no bill credits are issued. *See* Code § 56-585.1(A)(8).

On March 31, 2020, Appalachian filed its application with the Commission for a triennial review pursuant to Code § 56-585.1. For the 2017-2019 triennial-review period at issue in this case, Appalachian's approved ROE was 9.42%. In its application, Appalachian requested an increase in its base rates totaling nearly $65 million because its earnings were more than 70 points below its authorized ROE for the triennial-review period. Appalachian claimed that it had earned a return of 8.24% on its common equity, which was the equivalent of $23.6 million in pre-tax earnings below 8.72%, the bottom of its authorized ROE band.

In its application, Appalachian explained that its earnings during the test period reflected the recordation of three different costs authorized by Code § 56-585.1(A)(8). Appalachian recorded $88.3 million in December 2019 for "the remaining Virginia jurisdictional share of certain impaired coal generating assets that were retired early,"[3] which referred to several coal-

---

[3] The total impairment cost recorded on Appalachian's books was $93 million, but the Virginia retail share subject to the Commission's jurisdiction was $88.3 million. *See* 6 J.A. at 2904-05. *See generally* Code § 56-581(A).

2

fired power plants, or portions thereof, that were retired in 2015. 1 J.A. at 15. Appalachian also recorded $32.6 million for costs associated with severe weather events and $33.7 million for costs associated with projects necessary to comply with laws and regulations related to coal combustion by-product management. According to Appalachian, these three combined categories of costs resulted in its triennial earnings falling below the ROE band by $23.6 million, which was the reason it was requesting a 6.5% residential rate increase for the next 3 years.

Appalachian also asked the Commission to adjust its authorized ROE going forward to 9.9% instead of the existing 9.42%. Appalachian argued that this increase was necessary to reflect investment risks and the need for financial integrity and to ensure that it remained competitive with its peers. Lastly, Appalachian requested changes to existing rate schedules and certain terms and conditions to better reflect the costs incurred by the company. The Commission held an evidentiary hearing for Appalachian's application from September 14-18, 2020.

B. *Retirement of Coal-Fired Power Plants*

In 2011, Appalachian decided to retire early several of its coal-fired power plants, or portions thereof, in 2015. Appalachian's 2010 depreciation study reflected retirement dates between 2015 and 2019 for these facilities. In 2014, Appalachian confirmed that the planned 2015 retirements should be treated on the books as normal retirements (as opposed to abandonments) and included them in a new depreciation study filed as part of its 2014 biennial review.

In 2015, Appalachian retired these units as planned and ceased recording depreciation on them in accordance with applicable accounting standards. The retired units at that time had a remaining net book value of $88.3 million for Virginia jurisdictional purposes. The company's

3

July 2015 accounting memorandum referred to these retired units as "normal retirements" that were probable of future recovery and not "abandonment[s]." 6 *id.* at 2436.250. As a result, Appalachian did not record an impairment of the units' remaining net book value in 2015. In 2016, 2017, and 2018, Appalachian continued to report these units as normal retirements, not abandonments, and did not record an impairment. These decisions led to a significant depreciation-reserve deficiency.

In December 2019, Appalachian recorded these retired units as asset impairments so that all remaining costs would be recorded within the current triennial-review period as permitted by statute. Code § 56-585.1(A)(8) provides that "costs associated with asset impairments related to early retirement determinations made by the utility for utility generation facilities fueled by coal," which are "recorded per books by the utility for financial reporting purposes and accrued against income" and "not proposed for recovery under any other subdivision of this subsection," "shall be attributed to the test periods under review and deemed fully recovered in the period recorded."[4]

Appalachian explained in interrogatories submitted to the Commission's Staff that it had recorded the asset impairment "[b]ased on management's interpretation of Virginia law and more certainty regarding [Appalachian's] triennial revenues, expenses and resulting earnings upon reaching the end of the three-year review period." 6 J.A. at 2436.219; *see also id.* at 2436.226, 2436.263. Appalachian's accounting manager also stated in written testimony that the company had impaired these assets because, "based upon circumstances at that time," the remaining costs

---

[4] This subsection was amended in 2018 to remove the phrase "prior to December 31, 2012" after "costs associated with asset impairments related to early retirement determinations made by the utility" and to add the phrase "and deemed fully recovered in the period recorded." 2018 Acts ch. 296, at 513.

of the units were no longer "probable of future recovery" under generally accepted accounting principles ("GAAP") governing regulated operations because pursuant to Code § 56-585.1(A)(8), "such recorded costs are deemed to have been recovered from [Appalachian's] customers through rates in effect during" the triennial-review period. *Id.* at 2902; *see also* 8 *id.* at 3271 (testifying at the five-day hearing before the Commission that management deemed these costs "no longer probable of future recovery" because Appalachian "had sufficient earnings to recover those through [its] current rates through this triennial period"). External auditors reviewed Appalachian's financial statements between 2015 and 2019 and issued unqualified opinions that the financial statements conformed with GAAP, and Commission Staff admitted at the Commission hearing on Appalachian's application that Appalachian recorded an asset impairment "[f]or financial reporting purposes," 10 *id.* at 4240; *see also* 13 *id.* at 5660 ("Staff is not questioning the Company's accounting or attempting to force the Company to account for costs in a specific way under GAAP.").

In its response to Appalachian's application, Consumer Counsel's accounting witness proposed expensing the entire $88.3 million prior to 2017 with none of the costs being expensed within the current triennial-review period. Commission Staff proposed a plan that would separately amortize the $88.3 million over 10 years, beginning in 2015, the year that the units were retired. Doing so would mean that approximately 30% of the costs would be expensed within the current triennial review.

In rejecting Appalachian's recording of the entire $88.3 million within the current triennial-review period, the Staff concluded that "[t]he event that triggered the 2019 write-off was an evaluation of [Appalachian's] expected Triennial Period earnings, not an early retirement determination," 5 *id.* at 2295; *see also* 10 *id.* at 4166-67, making the asset impairment not

"related to early retirement determinations" as defined by Code § 56-585.1(A)(8). A Staff witness testified at the Commission's hearing on Appalachian's application that the language of the statute "makes it clear" that an early retirement determination and the recording of an asset impairment "are connected" and should be made simultaneously or contemporaneously with each other. *See* 10 J.A. at 4241-43.

The General Assembly passed House Bill 528 during the 2020 regular session, and after Appalachian had filed its triennial-review application, the Governor signed the bill, which became effective on July 1, 2020. The bill provides that the Commission must determine the amortization period for the recovery of any appropriate costs due to the early retirement of electric generation facilities and lays out certain factors that the Commission is required to consider in making that determination. *See* 2020 Acts ch. 662, at 994 (codified at Code § 56-585.1(E)). The parties disputed whether this bill was retroactive, making it applicable to Appalachian's triennial review and affecting how the Commission handled Appalachian's costs from the 2015 early retirement of some of its coal-fired power plants. This new legislation requires the Commission to establish an amortization period of recovery by "perform[ing] an independent analysis of the remaining undepreciated capital costs," "establish[ing] a recovery period that best serves ratepayers," and "allow[ing] for the recovery of any carrying costs that the Commission deems appropriate." Code § 56-585.1(E).

C. *Inter-Company Power Agreement*

In 2011, the Commission approved Appalachian's application to enter into an Inter-Company Power Agreement ("ICPA") with Ohio Valley Electric Cooperation ("OVEC"). One of the conditions of this approval was that Appalachian pay the lower of OVEC's cost or the market cost of non-affiliated power purchases for any energy and capacity purchases made under

6

the ICPA to serve its Virginia customers. *See In re Appalachian Power Co.*, Case No. PUE-2011-00058, 2011 WL 3528704, at \*2 (Va. S.C.C. Aug. 3, 2011). Appalachian was required to maintain records, available upon request, to show that any purchases it had made complied with this requirement. Appalachian purchased both energy and capacity under this ICPA.

As part of Appalachian's application, it presented evidence that its ICPA-energy costs were approximately $49 million below comparable market-energy costs. Appalachian did not provide similar evidence for comparable market-capacity costs, asserting that comparable data did not exist because it had purchased long-term capacity from OVEC and the only other market data was for short-term capacity. Instead of presenting market prices for capacity, Appalachian presented a 2011 Benchmark Study that demonstrated the costs of a comparable alternative to the long-term capacity (extending through 2040) that Appalachian had purchased under the ICPA — a "new build base-load power plant," 6 J.A. at 2874. Consumer Counsel presented comparisons of the ICPA-capacity costs to market-capacity costs that allegedly indicated payments by Appalachian were above market value. Consumer Counsel recommended that the amount of ICPA-capacity costs above market-capacity costs be removed from Appalachian's rates as excessive.

### D. *2017 Depreciation Study*

When the Commission conducted Appalachian's 2014 biennial review, it denied Appalachian's request to adjust depreciation rates for its coal-fired power plants and ruled that "depreciation rates should not be changed at this time" but that "the Commission [would] revisit this issue as part of [Appalachian's] next biennial review." *In re Appalachian Power Co.*, Case No. PUE-2014-00026, 2014 WL 6851256, at \*28 (Va. S.C.C. Nov. 26, 2014). The Commission made this decision because the EPA was in the process of adopting new rules that would "likely

7

affect the useful lives of all coal-fired plants" and that "could substantially impact the reasonableness of the depreciation studies and the resulting depreciation rates." *Id.* Accordingly, the Commission concluded that it would be reasonable to review depreciation rates at the next biennial review when the potential impacts of the EPA's proposed regulations would be further known pursuant to the new rules that were expected to be issued by then. *See id.* The General Assembly, however, subsequently enacted legislation freezing Appalachian's rates and canceling the next biennial review scheduled for 2016. *See* Code § 56-585.1:1(A).

Following the transitional-rate period, Commission Staff requested that Appalachian submit a study of depreciation rates for its assets as of December 31, 2017. Appalachian complied and provided Staff with the 2017 Depreciation Study. Appalachian, however, did not request approval for implementing the study's proposed depreciation rates and rejected the Commission Staff's request to implement the updated depreciation rates for 2018 and 2019 based on the Staff's revisions to the 2017 Depreciation Study. As part of its application, Appalachian calculated its depreciation expenses for 2018 and 2019 based on the depreciation rates approved by the Commission in 2012, not the depreciation rates produced by the 2017 Depreciation Study and the Staff's revisions.

E. *Commission's Findings*

Following the evidentiary hearing on Appalachian's triennial-review application, the Commission found that "Appalachian has not established that it was reasonable to conclude in December 2019 that the remaining costs of these retired units were no longer probable of future recovery" for the purposes of recording them as asset impairments. 14 J.A. at 5914-15. The Commission also rejected Appalachian's argument that the Commission had no discretion to review Appalachian's decision to record the asset impairments. The Commission reasoned that

8

"[i]n every historical earnings review under [Code § 56-585.1], the Commission has necessarily been required to rule on the reasonableness of the utility's regulatory accounting entries, along with other proposed regulatory adjustments from both the utility and case participants." *Id.* at 5914. After the Commission has determined the reasonableness of these entries and adjustments, Code § 56-585.1 dictates certain outcomes.

The Commission also held that Appalachian had not met its burden to establish the reasonableness of its depreciation expenses during the triennial period for purposes of determining its reasonable earned return. The Commission instead found that its Staff's revised 2017 Depreciation Study represented reasonable depreciation expenses and implemented the revised depreciation rates as of December 31, 2017. The Commission also found that its Staff's regulatory treatment of the retired units was reasonable and based upon sound professional judgment. The Staff's recommendations included removing the retired units from the 2017 Depreciation Study, implementing a 10-year straight-line amortization of their remaining costs from the date of their retirements, and converting the retired units into regulatory assets.

The Commission rejected Appalachian's argument that these findings unlawfully change base rates for prior rate periods when rates were otherwise frozen. The Commission pointed out that this Court has affirmed the legality of the Commission's consistent regulatory-accounting practice of establishing reasonable depreciation expenses and regulatory assets and has affirmed that such a practice does not constitute a retroactive change in rates. *See* 14 J.A. at 5918-19 (citing *Washington Gas Light Co. v. State Corp. Comm'n*, Record No. 040878, 2004 WL 7331918, at *1 (Va. Oct. 8, 2004) (unpublished)). The Commission did not apply Code § 56-585.1(E), which was added to the statute in 2020, to these proceedings. The Commission held

9

that this amendment to the statute became effective after Appalachian filed its triennial-review application and did not expressly state that the amendment was to operate retroactively.

Next, the Commission rejected Consumer Counsel's position that Appalachian incurred expenses under the ICPA, which was approved in 2011, greater than comparable market prices and that as a result, Appalachian's recognized triennial expenses should be decreased. The Commission found that Appalachian's ICPA-energy costs were $49 million below comparable market-energy costs and that Appalachian's ICPA-capacity costs could not be compared to market-capacity costs because the market-capacity costs proffered by Consumer Counsel for comparison purposes were for short-term capacity while the purchases under the ICPA were for long-term capacity.

Finally, the Commission determined that Appalachian's earned return was not more than 70 basis points above or below 9.42%. Accordingly, customers would not receive a bill credit, nor would Appalachian be permitted to increase its rates. The Commission also determined that Appalachian's ROE for the next triennial review should be reduced to 9.2%.

Both Appalachian and Consumer Counsel filed petitions for reconsideration. The Commission granted reconsideration and suspended its final order. In its reconsideration order, the Commission clarified that it "did not perform a going-forward rate review" and "did not 'set' or otherwise establish going-forward rates" based upon its determination of Appalachian's reasonable rate of return in the triennial-review period. 14 J.A. at 6180. However, it confirmed that a fair ROE in the next triennial period "was any point within the range of 8.3% to 9.3% and chose 9.2% for this purpose." *Id.* at 6180-81 n.6. Although the plain language of Code § 56-585.1 does not require a going-forward rate case in every historical earnings review, the Commission found no constitutional violations in denying a rate increase because the General

10

Assembly has provided other procedures by which a utility may challenge its rates. Specifically, Appalachian could apply for emergency rate relief under Code § 56-245 or a rate increase under Chapter 10 of Title 56 pursuant to the Commission's rate-case rules. The Commission also found that Appalachian's arguments on this point appeared to be barred under approbate-reprobate principles because, according to the Commission reading of the record, Appalachian had taken successive positions that were either inconsistent or mutually contradictory.

Next, the Commission reconsidered its findings related to Appalachian's 2015 retirement of certain coal-fired power plants. The Commission concluded that its findings continued to "represent a reasonable and rational exercise of [its] delegated discretion under [Code § 56-585.1]." 14 J.A. at 6184. The Commission found that Appalachian's decision to impair these assets was not reasonable because Appalachian never established that these assets were "no longer probable of future recovery" before recording the asset impairments. *Id.* at 6187. No change in circumstances or triggering event had occurred in 2019 to cause these assets to be impaired, and they remained probable of future recovery as they had been since their retirement in 2015.

The Commission rejected Appalachian's argument that the statute removed the Commission's regulatory discretion to review Appalachian's decision to record these asset-impairment costs under Code § 56-585.1(A)(8). Under the Commission's view, subsection D of the statute gives the Commission authority to challenge "the reasonableness or prudence of any cost incurred" by a utility. 14 J.A. at 6189. The Commission concluded that subsection A(8) "directs how the Commission must treat (i.e., deem fully recovered in the period recorded) certain costs" but "does not remove the Commission's authority to determine the reasonableness of such costs in the first instance." *Id.*

11

The Commission also rejected Consumer Counsel's request to reduce the $88.3 million remaining net book values with Appalachian's alleged overearnings from 2015 and 2016. The Commission determined that due to the transitional-rate period, Appalachian's regulatory earnings during those years had not been audited or litigated, and thus, the Commission had never concluded that Appalachian had over-earned. Under those circumstances, forcing Appalachian to write off any of the $88.3 million in 2015 and 2016 was unreasonable.

Finally, the Commission reconsidered its findings that ICPA-capacity costs should be allowed for purposes of determining Appalachian's earned return during the triennial-review period. The Commission reiterated its prior findings that the market-capacity costs proffered by Consumer Counsel for comparison were based on "a single-year construct" with a pricing model using a "three-year delivery period," while the ICPA-capacity costs were based on "a long-term baseload generation capacity asset that extends through 2040." *Id.* at 6198. The Commission also emphasized that other evidence presented by Appalachian was sufficient to establish the reasonableness of the ICPA-capacity costs. *See* 6 *id.* at 2874-76 (comparing the 2011 Benchmark Study to ICPA-capacity costs rather than Consumer Counsel's proffered market-capacity costs). Both Appalachian and Consumer Counsel appealed.

## II. APPALACHIAN'S APPEAL

On appeal, Appalachian's 11 assignments of error can be distilled into the following issues:

> A. whether impairment costs related to Appalachian's coal-fired power plants should have been deemed fully recovered in the triennial-review period in which they were recorded pursuant to Code § 56-585.1(A)(8),
>
> B. whether the Commission's refusal to order an increase in rates or to analyze the sufficiency of going-forward rates constituted a constitutional taking, and

12

> C. whether the Commission should have implemented the revised depreciation rates from Appalachian's 2017 Depreciation Study.

We will take up each of these issues in turn.

### A. *Coal-Fired Plant Impairment Costs*

#### 1.

The first issue involves a debate over the textual and contextual meaning of various statutory provisions. Well-established principles guide our interpretative task. Virginia tradition has always been to ask "not what the legislature intended to enact, but what is the meaning of that which it did enact. We must determine the legislative intent by what the statute says and not by what we think it should have said." *Carter v. Nelms*, 204 Va. 338, 346 (1963). We thus do not inquire as to "what the legislature meant; we ask only what the statute means." *Tvardek v. Powhatan Vill. Homeowners Ass'n*, 291 Va. 269, 277 n.7 (2016) (quoting Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899)).

Following this tradition, "[i]t is our duty to interpret the statute as written and when this is done our responsibility ceases." *City of Lynchburg v. Suttenfield*, 177 Va. 212, 221 (1941); *see also Continental Baking Co. v. City of Charlottesville*, 202 Va. 798, 805 (1961). Because "[w]e can only administer the law as it is written," *Coalter v. Bargamin*, 99 Va. 65, 71 (1901), the interpretative principle that precedes all others is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citation omitted).[5]

---

[5] A literal reading of the statutory text, of course, should never "result in a manifest absurdity." *Butler v. Fairfax Cnty. Sch. Bd.*, 291 Va. 32, 37 (2015). That said, "the anti-absurdity principle — understood in its legal sense — serves only as an interpretative brake on irrational literalism. This fail-safe applies in situations in which a purely literal reading forces

In this case, as in most cases involving statutory interpretation, litigants argue the competing policy virtues of their proffered interpretations. In Virginia, however, judicial review does not evaluate "the propriety, wisdom, necessity and expediency of legislation." *Willis v. Mullett*, 263 Va. 653, 658 (2002) (alteration omitted) (quoting *City of Richmond v. Fary*, 210 Va. 338, 346 (1969)). When a statutory text speaks clearly on a subject, "effect must be given to it regardless of what courts think of its wisdom or policy." *Temple v. City of Petersburg*, 182 Va. 418, 423 (1944). Courts committed to neutral principles of interpretation "are not 'free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal.'" *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1792 (2022) (quoting *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019)). Divinations of "the spirit or reason of the law," *Saville v. Virginia Ry. & Power Co.*, 114 Va. 444, 452 (1913), and "vague invocations of statutory purpose," *Southwest Airlines Co.*, 142 S. Ct. at 1792-93, cannot take precedence over a clearly worded statutory text.

2.

Working within this interpretative paradigm, we turn to the text of the governing statutes. The 2013 amendment to Code § 56-585.1(A)(8) permitted, inter alia, costs "associated with asset impairments related to early retirement determinations" that were "recorded per books by the utility for financial reporting purposes" to be "attributed to the test periods under review." *See* 2013 Acts ch. 2, at 7.[6] In 2018, another amendment to subsection A(8) required these costs as

_____

the statutory text into an 'internally inconsistent' conflict or renders the statute 'otherwise incapable of operation.'" *Tvardek*, 291 Va. at 280 (citation omitted).

[6] When the phrase "associated with asset impairments related to early retirement determinations" was added to the statute in 2013, it was limited to early retirement decisions "made by the utility prior to December 31, 2012," 2013 Acts ch. 2, at 7. In 2018, the phrase "prior to December 31, 2012" was deleted by the General Assembly. 2018 Acts ch. 296, at 513.

14

recorded to be "deemed fully recovered in the period recorded." 2018 Acts ch. 296, at 513.

When this statute was first enacted in 2007, a different subsection granted the Commission the

general power to "determine, during any proceeding authorized or required by this section, the

reasonableness or prudence of any cost incurred or projected to be incurred, by a utility in

connection with the subject of the proceeding." Code § 56-585.1(D). The combined text of the

2013 and 2018 amendments to subsection A, however, uses very different language:

> In any triennial review proceeding, for the purposes of reviewing
> earnings on the utility's rates for generation and distribution
> services, the following utility generation and distribution costs not
> proposed for recovery under any other subdivision of this
> subsection, *as recorded per books by the utility for financial
> reporting purposes* and accrued against income, *shall be attributed
> to the test periods under review and deemed fully recovered in the
> period recorded*:  costs associated with asset impairments related
> to early retirement determinations made by the utility for utility
> generation facilities fueled by coal . . . .

Code § 56-585.1(A)(8) (emphases added).

Appalachian argues that the plain meaning of the 2013 and 2018 amendments applies

specifically to this case. The syllogism is simple:

- The Commission was conducting a "triennial review proceeding." *Id.*

- The costs were "recorded per books by the utility for financial reporting purposes" in compliance with governing financial-reporting standards. *Id.*

- Thus, the costs "shall be attributed to the test periods under review and deemed fully recovered in the period recorded." *Id.*

In response, the Commission argues that subsection D continues to grant the Commission

regulatory discretion to determine on a case-by-case basis whether the shall-be command of

subsection A(8) should be understood as a mere suggestion that the Commission has the

discretion to either accept the recording and recovery of an asset-impairment cost as reasonable

15

or reject it as unreasonable. *See, e.g.*, Comm'n Br. (Record No. 210391) at 16 ("[T]he General Assembly gave the Commission the authority to determine the reasonableness of any cost in connection with this proceeding, and there is no statutory exclusion for asset impairment costs."). We believe traditional canons of statutory construction militate against this view.

a.

Statutory amendments are presumed to *amend* statutes — to change something that was there or to add something that was not there before. *See Kerns v. Wells Fargo Bank, N.A.*, 296 Va. 146, 157 (2018) ("[W]hen current and prior versions of a statute are at issue, there is a presumption that the General Assembly, in amending a statute, intended to effect a substantive change in the law." (citation omitted)); *City of Richmond v. Sutherland*, 114 Va. 688, 693 (1913) ("It must be presumed that the Legislature, in making the amendment, . . . intended by this added provision to make some change in the existing law."). Sometimes that presumption does not work, such as when an amendment seeks only to clarify and confirm existing law. *See Chappell v. Perkins*, 266 Va. 413, 420 (2003) ("Legislation is presumed to effect a change in the law unless there is clear indication that the General Assembly intended that the legislation declare or explain existing law."). But in the mine-run of cases, the presumption remains unrebutted. That is the case here.

The 2007 enactment of subsection D in Code § 56-585.1 granted the Commission regulatory discretion to determine "the reasonableness or prudence" of a utility's costs "incurred or projected to be incurred." The parties debate whether this statutory grant of discretion extends to determining the *time frame* in which those costs are recoverable. We need not resolve this debate, however, because the 2013 and 2018 amendments to subsection A(8) took away any such regulatory discretion to determine the reasonableness of "costs associated with asset impairments

16

related to early retirement determinations" for coal-fired power plants that were "recorded per books by the utility for financial reporting purposes and accrued against income." Code § 56-585.1(A)(8).[7] Those particular costs cannot be treated as a regulatory asset and amortized over whatever length of time the Commission deems to be reasonable or prudent. Instead, by statute, these costs "shall be attributed to the test periods under review and deemed fully recovered in the period recorded." *Id.* The imperative "shall be" applies both to the timing of the attribution of costs as well as to the timing of the recovery of those costs.

The 2013 amendment to subsection A(8) uses technical language found nowhere else in the Code of Virginia. There is no common, layperson meaning to the terms "asset impairments," "recorded per books," or "financial reporting purposes." These are terms of art used in the administrative regulations governing corporate finances. Because Code § 56-585.1(A)(8) addresses a "technical subject" using words "obviously transplanted from another legal source," Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)), we must "explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (alteration omitted)

_____

[7] Our colleagues in dissent contend that costs governed by subsection A(8) are still subject to the Commission's regulatory authority under subsection D because there is no express language in A(8) delineating such a limitation like there is in subsections A(4) and A(6) of the same statute. *See post* at 40. But under our view there is an obvious reason why the General Assembly thought it unnecessary to make such a proviso. By its plain terms, subsection A(8) wholly supplants the regulatory discretion authorized by subsection D because subsection A(8) only requires that the costs listed be "recorded per books by the utility for financial reporting purposes," taking those costs entirely out of the realm of regulatory accounting for the purposes of recovery. Subsections A(4) and A(6), however, do not mention financial reporting and thus require an express statement to remove the costs governed by those subsections from the Commission's regulatory discretion.

17

(quoting *Greenleaf v. Goodrich*, 101 U.S. 278, 284 (1880)).  This canon of interpretation is an obvious and ancient linguistic tool.  "[T]erms of art" and "technical terms," Blackstone reminded his 18th-century audience, "must be taken according to the acceptation of the learned in each art, trade, and science."  1 William Blackstone, Commentaries *60.  This concept is particularly pertinent when a law — like any one of the plethora of modern statutes — "regulates a particular trade, industry, or other narrowly defined sub-group."  James A. Heilpern, *Dialects of Art: A Corpus-Based Approach to Technical Term of Art Determinations in Statutes*, 58 Jurimetrics J. 377, 381 (2018).

The term-of-art canon applies to this case.  Code § 56-585.1(A)(8) speaks of costs "recorded per books by the utility for financial reporting purposes."  This expression has a highly refined legal meaning when applied to publicly traded companies incorporated in the United States.  Under subsection A(8), the books of these companies "for financial reporting purposes" are governed by rules and regulations promulgated by the Securities and Exchange Commission ("SEC") under authority granted by, inter alia, the Securities Act of 1933, the Securities and Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.[8]

Among other things, these statutes and a host of federal rules and regulations empower the SEC to enforce the financial-reporting duties imposed upon publicly traded companies.  One of the principal purposes of SEC oversight is to ensure that investors of publicly traded companies have accurate information from which to gauge the true worth of a company before

---

[8] *See generally* 1 Harold S. Bloomenthal & Samuel Wolff, Securities Law Handbook § 1:1 (2021) (discussing the "extensive delegated rule-making authority" of the SEC); 1 Brent A. Olson, Publicly Traded Corporations Handbook § 4.2 (2022) (outlining the regulatory framework).

deciding whether to buy, sell, or trade the company's stock.[9] To lawfully report the financial state of a publicly traded company to the SEC, the company must use the legal definitions and required practices known as "generally accepted accounting principles," or "GAAP." *See generally* 15 U.S.C. § 78m(b)(2)(B)(ii) (requiring companies to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets"). The SEC presumes that financial statements "not prepared in accordance with [GAAP]" are "misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

The Financial Accounting Standards Board ("FASB") issues authoritative restatements of GAAP, most recently in the FASB Accounting Standards Codification ("ASC") that was first published in 2009, and the SEC has recognized FASB as the standard setter since its creation in 1973. *See Ola v. YMCA of S. Hampton Rds., Inc.*, 270 Va. 550, 561 & n.3 (2005); Commission

---

[9] *See* 15 U.S.C. § 78b (listing one of the reasons for the necessity of SEC regulation as "insur[ing] the maintenance of fair and honest markets in [securities] transactions"); 15 U.S.C. § 78m(b)(2)(A) (requiring companies that file reports with the SEC to "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of [its] assets"); 17 C.F.R. § 240.12b-20 (requiring financial statement to be "not misleading"); 17 C.F.R. § 240.13b2-1 ("No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act [of 1934]"). *See generally Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194-95 (1976) (recognizing that SEC regulation of securities transactions through its "arsenal of flexible enforcement powers," "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing"); *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963) ("A fundamental purpose, common to these statutes [governing securities], was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.").

Guidance Regarding the Financial Accounting Standards Board's Accounting Standards Codification, 74 Fed. Reg. 42,772-73 (Aug. 25, 2009); Commission Statement of Policy Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, 68 Fed. Reg. 23,333-35 (May 1, 2003).[10]

Under GAAP, an asset impairment is simply "the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value." FASB ASC 360-10-20. An "impairment loss" exists when

> the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) *is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group).* That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use or under development. An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

FASB ASC 360-10-35-17 (emphasis added) (citations omitted). An asset is tested for "recoverability" when there are "events or changes in circumstances," FASB ASC 360-10-35-21, that could affect the "undiscounted cash flows expected to result from the use and eventual disposition of the asset," FASB ASC 360-10-35-17. The FASB ASC provides a list of example "events or changes in circumstances," including "[a] significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator," FASB ASC 360-10-35-21, but "the list of events

---

[10] Citations to the restatements of GAAP in the Accounting Standards Codification will be referenced by "FASB ASC" in this opinion. Fin. Acct. Standards Bd., How to Use the Codification 49 (2019), https://asc.fasb.org/cs/ContentServer?c=Document_C&cid=1175805121281&d=&pagename=FAF%2FDocument_C%2FCodDocumentPage&sitepfx=FAF.

and circumstances . . . is not intended to be all-inclusive," Joanne M. Flood, Wiley Practitioner's Guide to GAAP 2022: Interpretation and Application of Generally Accepted Accounting Principles 425 (2022).

No GAAP definition related to impairment expressly states or reasonably implies that cash flows are to be considered from the use and eventual disposition of *other assets or other asset groups not deemed to be impaired.* In fact, the asset-impairment section of the FASB ASC states the exact opposite. *See* FASB ASC 360-10-35-29 ("Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall include only the future cash flows . . . that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset (asset group)."). *See generally* Flood, *supra*, at 426-27. Income from sources other than the impaired assets are legally irrelevant to the question whether an asset should be deemed an unrecoverable loss and thus impaired for financial reporting purposes. To be sure, the point of the impairment-loss concept is to require companies to admit the obvious — that an asset should be considered a loss because the asset's carrying amount will not exceed the "cash flows" that would result from the continued "use" of the asset and its "eventual disposition." *See* FASB ASC 360-10-35-17. To not record the asset impairment properly would violate GAAP and mislead investors, lenders, suppliers, and customers.[11]

_____

[11] *See generally* Robert J. Haft et al., Securities Law Handbook Series: Due Diligence — Periodic Reports and Securities Offerings § 3:17 (2021-2022 ed.) (describing the requirement to disclose asset impairments under GAAP in SEC filings); 5C Arnold S. Jacobs, Disclosure and Remedies Under the Securities Laws § 12:23 (2022) (recognizing that "lack of conformity with [GAAP] principles is evidence that the statements are misleading" and that for impairments "a corporation must write down an investment's artificially created carrying value when it has notice that the value is substantially in excess of market"); 2 Olson, *supra* note 8, § 13A:39 (recognizing the standard for inferring scienter is "whether the need to write-down the asset was 'so apparent' to the defendant before the announcement [of financial statements] that a failure to take an earlier write-down amounts to fraud" (alterations and citation omitted)).

21

b.

In this case, independent public auditors verified Appalachian's reporting of the impaired assets. Consistent with GAAP standards and relevant federal laws, rules, and regulations, the auditors "perform[ed] procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and perform[ed] procedures that respond to those risks." 6 J.A. at 2929. "Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures" in Appalachian's financial statements and "evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements." *Id.* The auditors confirmed that Appalachian's books, including its entries for asset-impairment costs, were in conformity with GAAP.

Faced with this uncontradicted evidence, Commission Staff admitted that Appalachian properly recorded the asset impairment costs during the triennial-review period "[f]or financial reporting purposes," 10 *id.* at 4240, and that the Staff was "not questioning the Company's accounting or attempting to force the Company to account for costs in a specific way under GAAP," 13 *id.* at 5660. Thus, from the perspective of investors and the public at large, the costs were properly recorded on the company's books for financial reporting purposes consistent with GAAP.

This background is necessary because the 2013 and 2018 amendments to Code § 56-585.1(A)(8) are unlike any other statutory provision governing the Commission's regulatory authority. These amendments took away the Commission's regulatory discretion to override GAAP-compliant, asset-impairment costs "not proposed for recovery under any other subdivision of this subsection." Code § 56-585.1(A)(8). The plain language of the 2013 and

22

2018 amendments makes clear that asset-impairment costs "shall be attributed to the test periods under review and deemed fully recovered in the period recorded." *Id.* Prior to these amendments, this would not have been the case. A utility could comply with GAAP in recording asset-impairment costs and yet still have those costs deferred beyond the present review period by the Commission. The 2013 and 2018 amendments to subsection A(8) changed, not clarified, existing law by expressly limiting the Commission's broad scope of regulatory discretion under subsection D. *Cf. Appalachian Power Co. v. State Corp. Comm'n*, 284 Va. 695, 706 (2012) (holding that the use of "shall" in the statute governing the approval of a rate-adjustment petition "clearly states the intent of the legislature" and precluded the Commission from denying recovery for certain incurred costs, which the Commission had deemed would produce unjust and unreasonable rates).

What is true generally is true here: Where a statute includes a general provision with broad terms and a specific provision with narrow terms, the latter qualifies the former. *See Chesapeake Hosp. Auth. v. State Health Comm'r*, ___ Va. ___, ___, 872 S.E.2d 440, 447 (2022) ("Under the rules of statutory construction, when one statute speaks generally on an issue and another addresses the same issue in a more specific manner, 'the two should be harmonized, if possible, and where they conflict, the latter prevails.'" (citation omitted)); Scalia & Garner, *supra*, at 183 (stating that "[i]f there is a conflict between a general provision and a specific provision, the specific provision prevails"). The Commission erred in concluding otherwise.

3.

On brief and during oral argument, the Commission argued that our reasoning misses a crucial point — that the Commission made a factual finding that the assets (the early retired coal-fired power plants) were not impaired, Comm'n Br. (Record No. 210391) at 15-22, because the

23

costs associated with retiring these assets could be "recovered" through Appalachian's aggregate future rate income. *See* Oral Argument Audio (Record No. 210391) at 39:00 to 39:32. We take this claim seriously given our respect for the Commission's role in determining disputed facts and our deference to its factfinding. *See Wal-Mart Stores E., LP v. State Corp. Comm'n*, 299 Va. 57, 75 (2020); *City of Alexandria v. State Corp. Comm'n*, 296 Va. 79, 93-94 (2018). Even so, just as we do not allow litigants to camouflage legal conclusions as factual assertions, *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021), we do not defer to factual findings based upon faulty legal definitions, *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 736 (2012) ("[T]he Commission's decision, if based upon a mistake of law, will be reversed."). The Commission's assertion that the coal-fired power plants are not factually "impaired assets" makes two legal assumptions that we reject.

First, the Commission assumes that if Appalachian can successfully amortize the total costs in the future as a regulatory asset under approved rates, those costs are "probable of future recovery," Oral Argument Audio (Record No. 210391) at 39:13 to 39:47, and thus, by definition cannot be an impairment loss. This assumption relies on the Commission exercising broad discretion under Code § 56-585.1(D) and applying regulatory accounting principles pursuant to that discretion. The 2013 and 2018 amendments to subsection A(8), however, changed the law and removed the Commission's regulatory discretion for certain categories of costs, including asset-impairment costs related to early retirement determinations made by the utility for coal-fired power plants. *See supra* at 22-23. If the amendments to subsection A(8) did not change the law regarding the Commission's regulatory discretion for these costs, those amendments were meaningless because subsection D has been in Code § 56-585.1 since its inception. *See* 2007 Acts ch. 888, at 2418. Appalachian has argued to both the SCC below and to us on appeal that

24

amended subsection A(8) "does not permit the Commission to decide that a disagreement with an impairment 'on a regulatory accounting basis' can impact whether the impairment is recorded 'for financial reporting purposes.'" 14 J.A. at 6014-15 (citation omitted); *see also* Appalachian Br. (Record No. 210391) at 18-23; Reply Br. (Record No. 210391) at 1-6. We agree.

Regulatory accounting under FASB ASC Topic 980 allows a regulated entity to record a regulatory asset for the purpose of deferring costs "even though a nonregulated enterprise would be required to expense these costs currently" under financial accounting principles. Flood, *supra*, at 1300; *see also* FASB ASC 980-340-25-1 (recognition of regulatory assets). But amended subsection A(8) requires only that these asset-impairment costs, "as recorded per books by the utility for financial reporting purposes and accrued against income, shall be attributed to the test periods under review and deemed fully recovered in the period recorded." Under the governing legal standard for financial accounting purposes, an "impairment loss . . . is *not recoverable* if it exceeds the sum of the undiscounted *cash flows expected to result from the use and eventual disposition of the asset* (asset group)." FASB ASC 360-10-35-17 (emphasis added). The "use and eventual disposition of the asset" refers to the impaired asset, *id.*, not the company's remaining, unimpaired assets. Appalachian properly recorded these asset-impairment costs for financial reporting purposes as conceded by the Commission's Staff and confirmed by Appalachian's auditors. *See supra* at 20-22. From a pure financial accounting perspective, which is all that is required under amended subsection A(8), distinguishing impaired assets (which cannot financially save themselves) from unimpaired assets (which eventually can) is the very reason for the definition of impairment loss.

Second, the Commission's non-impairment factual finding presupposes that, as a matter of law, a determination of an impairment loss can only be made simultaneously with the early

25

retirement of an asset. *See* 14 J.A. at 6185 (noting that Appalachian decided in 2011 to early retire the assets and retired the assets in 2015 but that Appalachian "did not conclude that the units were impaired when retired" and "continued to conclude that the Retired Units were not impaired . . . until December 2019"). This conclusion, the Commission Staff argued below, follows from the statutory requirement that the asset impairments be "related to early retirement determinations," Code § 56-585.1(A)(8). *See* 5 J.A. at 2295; 10 *id.* at 4165-76, 4240-43. Upon this assumption, the Commission summarily rejected Appalachian's asset-impairment determination in 2019 because it could have been — and necessarily should have been — made in 2015 when the coal-fired power plants, or portions thereof, were retired early from service. *See* 14 *id.* at 6187 ("[A]t the time Appalachian recorded such [asset-impairment] cost, there had been no change or triggering event causing an impairment; i.e., the Retired Units were still probable of future recovery, just as they had been since 2015.").

We find no merit in the Commission's conflation of early retired assets and impaired assets. An asset can be retired from service early and never become impaired, and an impaired asset can easily be "related" to a prior early retirement, Code § 56-585.1(A)(8). Nothing in the statute requires these distinct actions to be contemporaneous. The "related" modifier means to be "[c]onnected in some way" or to have a "relationship to or with something else." Black's Law Dictionary 1541 (11th ed. 2019). It has a broader meaning than simultaneous or contemporaneous.[12]

_____

[12] *Cf. Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995) (recognizing that "related to" in a statute is a "choice of words" that "suggests a grant of some breadth"); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) (concluding that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan"); *McMullin v. Union Land & Mgmt. Co.*, 242 Va. 337, 341 (1991) (finding that "[a]n arbitration clause covering claims 'relating to' a contract is broader than a clause covering claims 'arising

The narrative of this case illustrates the relationship between the 2019 asset-impairment determination and the prior 2015 early retirement. In 2015, when Appalachian retired some of its coal-fired power plants, and portions thereof, the remaining net book value of these units for Virginia jurisdictional purposes was $88.3 million. Appalachian recorded this same $88.3 million amount as an asset-impairment cost in 2019. The $88.3 million is "related" or "connected" because it would not have existed without Appalachian's decision to early retire these units. This broad relationship is all that is required by Code § 56-585.1(A)(8).

In Appalachian's last review in 2014, Appalachian submitted a depreciation study that included proposed depreciation rates for the units that it anticipated retiring in 2015, but the Commission denied Appalachian's request to change depreciation rates at that time due to uncertainty of upcoming EPA regulation and the effect that it would have on coal-fired power plants, *see In re Appalachian Power Co.*, 2014 WL 6851256, at *28. The Commission instead directed that the depreciation rates be revisited at the next review scheduled for 2016. *See id.* That review, however, never happened because the General Assembly enacted legislation canceling the 2016 review. *See supra* note 2. While Appalachian submitted a new depreciation study in 2017 at the Commission's direction, a 2018 letter from the Commission regarding the study expressed "concerns about the Company's proposal to depreciate the undepreciated balance of the 2015 retirements" and recommended that Appalachian "address its proposed accounting and ratemaking treatment of the 2015 Retirements in the Company's next triennial review," which was then scheduled for 2020. 6 J.A. at 2436.169. In 2018, the General Assembly also amended Code § 56-585.1(A)(8), directing that asset-impairment costs related to early retirement determinations "for the purposes of reviewing earnings on the utility's rates for

out of' a contract" (citation omitted)).

27

generation and distribution services" should be "deemed fully recovered in the period recorded."

2018 Acts ch. 296, at 513.

As Appalachian explained, this series of events "constitute[d] a change in circumstances" that permitted Appalachian to record the $88.3 million net book value of its retired assets as an asset impairment because applicable GAAP standards were satisfied under newly amended subsection A(8). *See* 6 J.A. at 2944; 13 *id.* at 5498.[13] This decision by Appalachian to record the asset-impairment costs in 2019 was confirmed by an independent auditor as complying with GAAP. 6 *id.* at 2929. Because the 2013 and 2018 amendments to Code § 56-585.1(A)(8) have removed the Commission's discretion to alter the recovery of these costs that were recorded on the books for financial reporting purposes, the Commission's factfinding on this issue is based on mistakes of law and must be reversed.[14]

---

[13] Given our holding, it is unnecessary to address Appalachian's argument that even under the Commission's theory of probable future recovery under regulatory accounting, the Commission's 10-year amortization plan that begins in 2015 does not make the entire $88.3 million probable of future recovery. First, Appalachian argues that the amortized costs covering 2015 and 2016 will never be recovered because those years were outside the triennial-review period. *See* Oral Argument Audio (Record No. 210391) at 46:22 to 46:52. Second, the amortized costs distributed from 2017-2019 during the triennial-review period will never be recovered in the future because rates are only adjusted in a going-forward rate case in a triennial review and rates are not adjusted retroactively. *See id.* at 46:53 to 47:13. Under Appalachian's view, while half of the $88.3 million may be probable of "recovery" in the future under the Commission's amortization plan, not all of it will be recovered because half of that amount will have already been distributed to previous years not covered by future rate changes.

[14] Nothing in this opinion should be read to contradict the remainder of Code § 56-585.1(A)(8), including the provision that the Commission "shall . . . authorize deferred recovery of such costs" that "fall more than 70 basis points below the fair combined rate of return" and "allow the utility to amortize and recover such deferred costs over future periods as determined by the Commission."

B.  *Constitutional Taking*

In the alternative, Appalachian argues that the Commission's refusal to order an increase in rates or to analyze the sufficiency of going-forward rates constituted a constitutional taking. Given our holding that the Commission erred in finding that the asset-impairment costs were unreasonable, we need not address this alternative argument as it is now moot.  *See Commonwealth v. White*, 293 Va. 411, 419 (2017) (reaffirming that "[t]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available'").

C.  *Depreciation Rates*

Finally, Appalachian argues that the Commission erred in implementing depreciation rates from a revised 2017 Depreciation Study for the years 2018 and 2019.  "[T]he standard of review applied to a Commission decision 'will depend on the nature of the decision under review.'"  *City of Alexandria*, 296 Va. at 93 (citation omitted).  While we are "not inextricably bound" by and "will not hesitate to reverse" a Commission's decision that "is based on a mistake of law," the Commission's findings of facts are reviewed under a different paradigm.  *Id.* at 93-94 (citation omitted).

"The Commission is charged with the responsibility of finding the facts and making a judgment," and "[t]his [C]ourt is neither at liberty to substitute its judgment in matters within the province of the Commission nor to overrule the Commission's finding of fact unless we can say its determination is contrary to the evidence or without evidence to support it."  *Board of Supervisors of Campbell Cnty. v. Appalachian Power Co.*, 216 Va. 93, 105 (1975).  "In this context, we only ask whether a rational factfinder could have interpreted the historical facts, accompanied by reasonable inferences therefrom, in a way supportive of and consistent with the SCC's conclusions."  *City of Alexandria*, 296 Va. at 94.  This highly deferential standard exists

29

because the Commission "is exercising a legislative function delegated to it by the General Assembly" when exercising its ratemaking authority. *Id.* (citations omitted). "We thus 'presume that where the General Assembly has not placed an express limitation in a statutory grant of authority, it intended for the Commission, as an expert body, to exercise sound discretion.'" *Id.* (citation omitted).

The Commission ordered at Appalachian's last review in 2014 that "depreciation rates should not be changed at this time" and that the issue would be revisited at the "next biennial review." *In re Appalachian Power Co.*, 2014 WL 6851256, at *28. Because the General Assembly canceled the 2016 biennial review, Appalachian contends that the language in the Commission's 2014 order means that "any changes to [Appalachian's] depreciation rates were delayed until this proceeding"[15] and that the Commission erred in "disregard[ing] its 2014 Final Order" and implementing depreciation rates from the revised 2017 Depreciation Study for 2018 and 2019. Appalachian Br. (Record No. 210391) at 36, 38-39. The Commission, however, did not err in finding that Appalachian's depreciation rates were unreasonable.

To begin, Appalachian has the "burden to show that the expenses it seeks to have included in its rate base are just and reasonable," *Hopewell Cogeneration Ltd. P'ship v. State Corp. Comm'n*, 249 Va. 107, 115 (1995) (citing Code § 56-235.3), and Appalachian has failed to do so. Appalachian's sole argument on appeal is that the Commission is bound by the

---

[15] This contention that the depreciation-rate change was delayed because of the rate freeze put in place by the General Assembly when it canceled the 2016 biennial review fails to recognize "the distinction between the 'rates' which are allowed to be charged by an electric utility as determined by the Commission for a biennial period, and the 'ROE' set in the same biennial review process." *Virginia Elec. & Power Co.*, 284 Va. at 736. Just because the General Assembly froze the rates that Appalachian was allowed to charge does not mean that the depreciation rates that help determine Appalachian's ROE were also necessarily frozen during this period.

depreciation rates previously approved by the Commission in 2012 because the Commission's 2014 order did not change the rates at that time and stated that it would revisit the issue at the next review. But nothing in the Commission's 2014 order alters Appalachian's burden to show that the depreciation expenses it sought to include in its rate base were reasonable. Nor does any language in the Commission's 2014 order take away the Commission's discretion to review the reasonableness of Appalachian's depreciation expenses as part of the present triennial-review proceeding. And no statutory provision expressly limits the Commission's authority to review the reasonableness of Appalachian's depreciation expenses in this scenario. For these reasons, we presume that the General Assembly "intended for the Commission, as an expert body, to exercise sound discretion" in determining reasonable depreciation rates for Appalachian, *City of Alexandria*, 296 Va. at 94.

Appalachian was carrying a significant depreciation-reserve deficiency during the triennial period under review and did not request a change in depreciation rates to address that deficiency. Instead, the Commission's Staff in 2017 requested that Appalachian submit a new depreciation study when the Staff realized that Appalachian was still using rates implemented from a 2010 depreciation study despite the Commission's expectation that depreciation studies should be submitted at least every five years. *See* 12 J.A. at 5178. In this triennial-review proceeding, the Commission in its sound discretion implemented the depreciation rates from the revised 2017 Depreciation Study for the years 2018 and 2019. Because a rational factfinder could have interpreted these facts as supportive of the Commission's conclusion that Appalachian's depreciation rates were not reasonable due to its significant depreciation-reserve deficiency, we cannot overrule the Commission's findings on this issue.

31

III.  CONSUMER COUNSEL'S APPEAL

In its cross-appeal, Consumer Counsel contends that the Commission's final order erred in three ways:

A. the Commission failed to apply Code § 56-585.1(E) retroactively;

B. the Commission should not have established a regulatory asset for the early retirement costs of the coal-fired power plants, which would be amortized over ten years, but instead should have deemed those costs to be recovered by Appalachian's overearnings in 2015 and 2016; and

C. the Commission should not have found Appalachian's evidence sufficient to demonstrate that its ICPA costs were lower than market costs.

We will address each of these issues in turn.

A.  *Retroactive Application of Code § 56-585.1(E)*

In the 2020 regular session, the General Assembly passed House Bill 528, adding subsection E to Code § 56-585.1.  *See* 2020 Acts ch. 662, at 994.  Code § 56-585.1(E) provides: "Notwithstanding any other provision of law, the Commission shall determine the amortization period for recovery of any appropriate costs due to the early retirement of any electric generation facilities owned or operated by any Phase I Utility or Phase II Utility."  The new subsection further lays out certain factors that the Commission shall consider in making that determination. Appalachian filed its triennial-review application on March 31, 2020, and subsection E became effective on July 1, 2020.  We have previously recognized that "when a statute is amended while an action is pending, the rights of the parties are to be decided in accordance with the law in effect when the action was begun, unless the amended statute shows a clear intention to vary such rights."  *Washington v. Commonwealth*, 216 Va. 185, 193 (1975).

"It has long been the law of the Commonwealth that retroactive application of statutes is disfavored and that 'statutes are to be construed to operate prospectively only unless a contrary intention is manifest and plain.'" *City of Charlottesville v. Payne*, 299 Va. 515, 528 (2021) (citation omitted). "Absent an express manifestation of intent by the legislature, this Court will not infer the intent that a statute is to be applied retroactively." *Id.* (citation omitted). Chief Justice Marshall long ago advised that "a court . . . ought to struggle hard against a [statutory] construction which will, by a retrospective operation, affect the rights of parties." *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801). "The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (citation omitted).

On appeal, Consumer Counsel contends that subsection E should be interpreted to apply retroactively to Appalachian's triennial-review application because it "contains clear language showing retrospective legislative intent." Consumer Couns. Br. (Record No. 210634) at 17. We disagree. Nothing in the language of subsection E makes it manifest and plain that the General Assembly intended for the subsection to apply retroactively.

In support of its argument, Consumer Counsel focuses heavily on one word in subsection E and one opinion among the dozens of our opinions addressing the retroactivity doctrine. The word is "any," which was used twice in the new subsection: "any appropriate costs" and "any electric generation facilities owned or operated." Code § 56-585.1(E). As the sole authority for the claim that "any" indicates retroactive intent, Consumer Counsel cites *Sussex Community Services Ass'n v. Virginia Society for Mentally Retarded Children, Inc.*, 251 Va. 240 (1996). In that 4-3 opinion, the majority held that the language "any restrictive covenant" in a statutory

33

amendment governing the construction of certain types of restrictive covenants should be interpreted to apply retroactively and encompassed the construction of all restrictive covenants of that type "whether recorded before or after" the enactment of the amendment. *Sussex*, 251 Va. at 244-45. In his dissent, Chief Justice Carrico stated that retroactive intent should not be so easily inferred from the sole use of the word "any" and that a broader perspective confirmed that the General Assembly was not attempting to apply the statute retroactively. *Id.* at 245-46 (Carrico, J., dissenting).

The Commission in the present case summarily rejected Consumer Counsel's argument that relied upon *Sussex*. We reject it as well. In *Sussex*, the statutory amendment in question was being applied prospectively by the majority to an event that would occur, if at all, *after* the amendment's enactment — the alleged breach of a restrictive covenant — not retroactively to the recording of that restrictive covenant, an event "completed before its enactment," *Martin*, 527 U.S. at 357-58. This before-and-after distinction is critical for understanding why the factual context and legal reasoning of *Sussex* are inapplicable here.

The United States Supreme Court emphasized this distinction in *Union Dry Goods Co. v. Georgia Public Service Corp.*, a case in which a state had mandated a rate increase for sales of electricity that became effective in the second year of a five-year sales contract between a supplier and buyer of electricity. *See* 248 U.S. 372, 373 (1919). The Supreme Court held that the legally prescribed rate prospectively applied to all sales of electricity after the effective date of the rate increase but not to the sales of electricity that had already occurred. *See id.* at 375-77. It did not matter that the parties before the court still had three more years left on their contract subject to the lower price.

34

By analogy, the same was true in *Sussex*.  It did not matter that the restrictive covenant had been recorded many years prior to the statutory amendment and continued to run with the land because the statutory amendment only applied prospectively to the interpretation of whether the restrictive covenant had been breached after the amendment's enactment.  While the ratio decidendi of *Sussex* was reasonably debatable, the result was clearly correct because the new statutory amendment applied to the interpretation of the restrictive covenant sought to be enforced after the amendment's enactment and declared that the covenant should be construed to include the proposed use of the property.  For this reason, the Commission correctly rejected Consumer Counsel's interpretation and application of *Sussex* to this case.

The Commission also rejected Consumer Counsel's argument that the phrase "[n]otwithstanding any other provision of law" in Code § 56-585.1(E) "bolsters retrospective intent," Consumer Couns. Br. (Record No. 210634) at 19.  This language does not make subsection E retroactive.  The non obstante phrase merely means that when subsection E does apply (the presumption is that it applies prospectively only) it takes precedence over any other conflicting provision of law.  *See generally* Scalia & Garner, *supra*, at 126-27.

Beyond the absence of a manifest and plain intention for subsection E to be applied retroactively in the text of subsection E, another bill amending Code § 56-585.1 in the same 2020 General Assembly session demonstrates that the General Assembly did not intend for the new subsection E to be applied retroactively.  Senate Bill 731 added an additional requirement for the Commission's determination of the company's fair rate of ROE, effective July 1, 2020, but also included the language in two different subsections that this additional requirement should apply to "applications received by the Commission on or after January 1, 2020," 2020 Acts ch. 1108, at

35

2120 (codified as amended at Code § 56-585.1(A)(2)(a)-(b)).  This language indicated a manifest and plain retroactive application of the new statutory language.

As we have previously stated, "in enacting other amendments to the Act, the General Assembly employed language plainly manifesting a retroactive intent," and "failure to use language of this nature" in another amendment to the same statute demonstrates that it was "not intended to be applied retroactively," *Berner v. Mills*, 265 Va. 408, 414 (2003).  In other words, "the General Assembly knows how to make its intent manifest that a statute has retroactive application," *City of Charlottesville*, 299 Va. at 531.  In this case, there is no textual support that the General Assembly intended for subsection E to be applied retroactively, and the contextual language of other amendments made to the same statute in the same General Assembly session demonstrates that subsection E was not intended to operate retroactively.[16]  The Commission, therefore, did not err in summarily rejecting Consumer Counsel's retroactivity argument.

## B. *Recovery of Early Retirement Costs*

In its appeal, Consumer Counsel challenges both Appalachian's recording of the early retirement costs of its coal-fired power plants as asset-impairment costs and the Commission's ten-year amortization plan for the early retirement costs in its final order.  Consumer Counsel instead argues that if the Commission had considered Appalachian's overearnings from 2015 and 2016, it would have found that the early retirement costs had already been recovered by Appalachian through revenues collected in 2015 and 2016.  *See* Consumer Couns. Br. (Record

---

[16] Given our holding that subsection E should not be applied retroactively, we need not address Consumer Counsel's argument that retroactive application of subsection E does not disturb a vested or substantive right, *see* Consumer Couns. Br. (Record No. 210634) at 23-28, or Appalachian's contention that subsection E does not apply at all to asset impairments and has no effect on subsection A(8), *see* Appalachian Br. (Record No. 210634) at 14-17.

No. 210634) at 28-38.  Given our holding above that the Commission erred in finding that the asset-impairment costs were unreasonable, *see supra* at 28, we need not address Consumer Counsel's argument as it is now moot.  *See White*, 293 Va. at 419 (applying the best-and-narrowest doctrine).

## C.  *ICPA Costs*

Consumer Counsel's final issue contends that the Commission erred in finding that Appalachian's evidence was sufficient to demonstrate that its ICPA costs were lower than market costs.  We see no merit in this contention.

The Commission has the statutory authority "to scrutinize transactions between a utility and one of its affiliates" because "the contracting parties have a unity of interests and do not deal at arm's length," which presents "the opportunity for double profit at the ratepayers' expense." *Commonwealth Gas Servs., Inc. v. Reynolds Metals Co.*, 236 Va. 362, 367 (1988).  Appalachian bore the burden of proving the reasonableness of affiliate expenses under the ICPA.  *See id.* at 368.  The question is whether Appalachian met this burden by submitting "satisfactory proof . . . to the Commission of the cost to the affiliated interest," Code § 56-78.  "No proof shall be satisfactory . . . unless it includes the original (or verified copies) of the relevant cost records and other relevant accounts of the affiliated interest . . . properly identified and duly authenticated." Code § 56-79.  In its 2011 order approving the ICPA, the Commission stated:  "For cost recovery purposes during any rate proceeding, [Appalachian] bears the burden to prove that, for any purchases made from OVEC to serve [Appalachian's] Virginia jurisdictional customers, [Appalachian] paid the lower of OVEC's cost or the market price of non-affiliated power." *In re Appalachian Power Co.*, 2011 WL 3528704, at *2.

Sufficient evidence supports the Commission's factual finding that Appalachian shouldered its burden of proof on this issue in the 2020 triennial-review proceeding. Appalachian presented a 2011 Benchmark Study that demonstrated the costs of a comparable alternative to the long-term capacity (extending through 2040) that Appalachian had purchased under the ICPA — a "new build base-load power plant," 6 J.A. at 2874. Contesting this assertion, Consumer Counsel presented evidence of short-term, market-capacity costs that were based on a single-year construct with a three-year delivery period. The Commission stated in its reconsideration order that it had considered the evidence of both Appalachian and Consumer Counsel and found that "current market data does not exist to reasonably compare ICPA capacity costs." 14 *id.* at 6198. The Commission further "found sufficient other evidence presented by [Appalachian] to establish the reasonableness of such costs for purposes of the triennial review." *Id.*

When the evidence does "little more than show that the parties' experts disagreed," this "does not render the Commission's findings contrary to the evidence." *Wal-Mart Stores E., LP*, 299 Va. at 74 (citation omitted). "The Commission is entitled to interpret the conflicting evidence and to decide the weight to afford it." *Id.* (citation omitted). "We cannot sit as a board of revision to substitute our judgment for that of matters within the province of the Commission." *City of Alexandria*, 296 Va. at 103. We thus affirm the Commission's findings on this issue.[17]

---

[17] Given our ruling, we offer no opinion on Appalachian's argument that federal-preemption principles preclude the Commission from disallowing the ICPA costs. *See* Appalachian Br. (Record No. 210634) at 39-44.

## IV. CONCLUSION

In sum, we hold that (i) the Commission erred in finding that it was not reasonable for Appalachian to record its costs associated with the early retirement of its coal-fired power plants as asset impairments; (ii) the Commission did not err by implementing depreciation rates from the revised 2017 Depreciation Study for the years 2018 and 2019 in the triennial review; (iii) the Commission did not err by refusing to apply Code § 56-585.1(E) retroactively; and (iv) the Commission did not err in finding Appalachian's affiliate costs under the ICPA to be reasonable. All remaining issues in both appeals are now moot. Accordingly, the Commission's rulings are affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

SENIOR JUSTICE MIMS, with whom JUSTICE POWELL joins, dissenting in part.

In section II.A.2 of the Court's opinion, the majority holds that the 2013 and 2018 amendments to Code § 56-585.1(A)(8) took away the Commission's discretion to determine the reasonableness of "costs associated with asset impairments related to early retirement determinations" for coal-fired power plants that were "recorded per books by the utility for financial reporting purposes and accrued against income." Code § 56-585.1(A)(8). According to the majority, once Appalachian recorded the asset impairment costs in its books, the Commission was required by Code § 56-585.1(A)(8) to attribute the asset impairment costs "to the test periods under review and deem them fully recovered in the period recorded." *Id.* I disagree, and therefore respectfully dissent from this portion of the majority's opinion.

39

In determining that it had authority to review the reasonableness of Appalachian's decision to record the asset impairment costs, the Commission relied on Code § 56-585.1(D), which states as follows:

> The Commission may determine, during any proceeding authorized or required by this section, the reasonableness or prudence of any cost incurred or projected to be incurred, by a utility in connection with the subject of the proceeding. A determination of the Commission regarding the reasonableness or prudence of any such cost shall be consistent with the Commission's authority to determine the reasonableness or prudence of costs in proceedings pursuant to the provisions of Chapter 10 (§ 56-232 et seq.)

The first sentence of subsection (D) is an extremely broad grant of authority by the General Assembly, authorizing the Commission to review "*the reasonableness or prudence of any cost*" incurred by a utility. The only time that authority is curtailed is in certain narrow instances where the General Assembly has specifically delineated such a limitation. For example, in Code § 56-585.1(A)(6), the General Assembly determined that certain costs associated with new underground facilities created to improve electric service reliability were "in the public interest" and therefore would be "deemed to be reasonable and prudently incurred and, notwithstanding the provisions of subsection C or D, shall be approved for recovery by the Commission." Similarly, in Subsection (A)(4), the General Assembly carved out additional costs that would not be subject to a reasonableness inquiry in accordance with Subsection (D). Subsection (A)(4) states that certain costs incurred by the utility for transmission services, demand response programs approved by the Federal Energy Regulatory Commission, and providing service to a business park "shall be deemed reasonable and prudent." Code § 56-585.1(A)(4).

Significantly, the General Assembly added the referenced specific exclusion from the effect of Subsection (D) to Subsection (A)(6) in 2018, during the same session that it amended Subsection (A)(8) to include the language that would deem the costs recorded per books by the utility "fully recovered in the period recorded." 2018 Acts ch. 296. However, the General Assembly did not include a similar carve out from Subsection (D) in Subsection (A)(8).

It is notable that in Section III.A of its opinion, when considering whether the General Assembly intended to apply amendments to Subsection (E) retroactively, the majority found it significant that during the same session, the General Assembly employed specific language to manifest its retroactive intent in to two different subsections. Because the General Assembly did not employ the same language in Subsection (E), the majority concludes that it did not intend Subsection (E) to operate retroactively. Similarly, because the General Assembly added a specific exclusion from Subsection (D) to Subsection (A)(6) in 2018 but did not include such an exclusion in Subsection (A)(8) during the same session, I conclude that asset impairment cost claims remain subject to review for "reasonableness and prudence" by the Commission.

"The Commission is a specialized body with broad discretion in regulating public utilities." *Level 3 Commc'ns of Va., Inc. v. State Corp. Comm'n*, 268 Va. 471, 474 (2004). Further, we "presume that where the General Assembly has not placed an express limitation in a statutory grant of authority, it is intended for the Commission, an expert body, to exercise sound discretion." *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 741 (2012). This Court has repeatedly said that "[w]hen interpreting and applying a statute, we 'assume that the General Assembly chose, with care, the words it used in enacting the statute, and we are bound by those words.'" *Kiser v. A.W. Chesterton Co.,* 285 Va. 12, 19 n.2 (2013) (quoting *Halifax Corp. v. First Union Nat'l Bank,* 262 Va. 91, 100 (2001)); *accord Rives v. Commonwealth,* 284

41

Va. 1, 3 (2012). Therefore, "'when the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional.'" *Id.* (quoting *Zinone v. Lee's Crossing Homeowners Ass'n,* 282 Va. 330, 337 (2011)).

Because the General Assembly chose not to include a carve out from Subsection (D) in Subsection (A)(8), I believe it intended Subsection (D) and Subsection (A)(8) to be read together. *See, e.g., Pro. Bldg. Maint. Corp. v. Sch. Bd. of Cty. of Spotsylvania*, 283 Va. 747, 757 (2012) (Mims, J., concurring) (observing that underlying statute within the Virginia Public Procurement Act and the 2000 amendment thereto "must [be] read . . . as an integrated whole") (citing *Alston v. Commonwealth*, 274 Va. 759, 769 (2007) (statutes "should be so construed as to harmonize the general tenor or purport of the system and make the scheme consistent in all its parts and uniform in its operation, unless a different purpose is shown plainly or with irresistible clearness")); *Bowman v. Concepcion*, 283 Va. 552, 563 (2012) ("[W]e will construe statutes that address the same general subject 'so as to avoid repugnance and conflict between them and, if possible, to give force and effect to each of them.'") (quoting *City of Lynchburg v. English Constr. Co.*, 277 Va. 574, 584 (2009)). Under this construct, the Commission retains its authority to determine "the reasonableness or prudence of any cost incurred" by a utility in the categories listed under Subsection (A)(8). Accordingly, the Commission was acting within its authority when it considered whether it was reasonable for Appalachian to record $88.3 million in asset impairment costs in 2019.

Asset impairment costs associated with the retired units was the most contentious issue before the Commission. It considered three different proposals regarding the $88.3 million asset

42

impairment cost. According to Appalachian, because it recorded the $88.3 million as an asset impairment cost in its books for financial reporting purposes, the full amount of this expense fell within the earnings review period, and Appalachian would be entitled to a rate increase. Consumer Counsel asserted that none of the $88.3 million should be considered an expense within the earnings review period, which likely would have led to a decrease in Appalachian's rates. The third proposal, and the one the Commission found reasonable and approved, was put forth by Commission Staff and recommended the $88.3 million cost be amortized over ten years, starting in 2015 when the units were retired. This resulted in approximately 30% of the expense falling within the current earnings review period. I believe it was within the Commission's broad discretion to determine that this proposal was the most reasonable way to allocate the asset impairment costs.

The majority's holding also takes away the Commission's ability to protect rate payers from potentially unreasonable accounting practices that will result in rate increases. Now that Appalachian will be permitted to allocate all the asset impairment costs for the retired units in 2019, Appalachian's earnings for the triennial review period will be lowered to such an extent that the Commission will be required to conduct a going-forward rate case and Appalachian will be entitled to raise its rates. In its application, Appalachian stated that its proposed rate increases "are designed to effect an increase of approximately $65 million over current rates." (JA 16). Appalachian acknowledged that under its proposal, on average, most rate payers would see a 6.5% increase (JA 17). While other actions taken by the Commission might result in a slightly lower increase, there is no doubt that Appalachian's accounting choices for this triennial review period, the reasonableness of which the Commission can no longer review, will result in a rate increase.

43

I believe the Commission properly exercised its authority under Code § 56-585.1(D) when it reviewed the reasonableness of Appalachian's decision to record the asset impairment costs in 2019, and I would affirm the Commission's ruling on this issue.  I therefore respectfully dissent from Section II.A.2 of the majority's opinion. I join the remainder of the opinion.